# United States Court of Appeals
## For the First Circuit

Nos. 18-1188, 19-1010

UNITED STATES,

Appellee,

v.

CARLOS VELAZQUEZ-FONTANEZ,

Defendant, Appellant.

No. 18-1215

UNITED STATES,

Appellee,

v.

RUBEN COTTO-ANDINO, a/k/a Ruben El Negro,

Defendant, Appellant.

No. 18-2265

UNITED STATES,

Appellee,

v.

JOSE D. RESTO-FIGUEROA, a/k/a Tego,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Howard, Chief Judge,
Thompson and Kayatta, Circuit Judges.

Maria Soledad Ramirez-Becerra, with whom Maria Soledad Ramirez Becerra Law Office was on brief, for appellant Carlos Velazquez-Fontanez.
José Luis Novas Debién for appellant Ruben Cotto-Andino.
Michael R. Hasse for appellant Jose D. Resto-Figueroa.
Michael A. Rotker, Attorney, Criminal Division, Appellate Section, with whom W. Stephen Muldrow, United States Attorney, Victor O. Acevedo-Hernandez, Assistant United States Attorney, Alberto R. Lopez-Rocafort, Assistant United States Attorney, and Brian C. Rabbitt, Acting Assistant Attorney General, Criminal Division, were on brief, for appellee.

July 27, 2021

**KAYATTA**, <u>Circuit Judge</u>. A federal grand jury in the District of Puerto Rico returned an indictment charging 105 individuals with various criminal offenses connected to La Rompe ONU, a drug trafficking organization that operated from 2007 until at least July 17, 2015, in San Juan, Puerto Rico. Following a trial, three of the indicted defendants -- Carlos Velazquez-Fontanez, Jose D. Resto-Figueroa, and Ruben Cotto-Andino -- were convicted on every count charged against them. On appeal, they challenge their convictions on several grounds. For the reasons that follow, we affirm Velazquez-Fontanez's and Resto-Figueroa's convictions; we vacate Cotto-Andino's convictions; and we remand for further proceedings consistent with this opinion.

## I. BACKGROUND

We begin with the essential background facts. In 2004, drug traffickers in San Juan, Puerto Rico, formed "La Organización de Narcotraficantes Unidos" ("La ONU"), a cartel designed to reduce conflicts between traffickers and to avoid police scrutiny. By 2008, La ONU had splintered into two rival gangs, La ONU and La Rompe ONU ("La Rompe"). The two groups have since waged war over control of San Juan's most profitable drug distribution territory. At drug distribution "points" under its control, La Rompe sold marijuana, cocaine, crack cocaine, heroin, and prescription drugs.

To secure and finance La Rompe's drug-trafficking activities, its members committed robberies, carjackings, and contract killings.

La Rompe's leaders decided who could sell drugs in its territory, ordered lower-ranking members to commit robberies or killings, and authorized La Rompe members to kill fellow members when intra-gang disputes arose. Members rose up La Rompe's ranks by hunting down and killing members of La ONU.

The indictment claimed that Cotto-Andino, Velazquez-Fontanez, and Resto-Figueroa were members of La Rompe. It charged them with racketeering conspiracy in violation of 18 U.S.C. § 1962(d) based on numerous acts of drug trafficking and several murders, and with conspiracy to possess with intent to distribute cocaine, crack cocaine, heroin, and marijuana within 1,000 feet of a public-housing facility in violation of 21 U.S.C. §§ 841(a)(1), 846, and 860. The indictment also charged Velazquez-Fontanez with drive-by-shooting murder in furtherance of a major drug offense in violation of 18 U.S.C. § 36(b)(2)(A) and with using a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A), (j)(1)-(2). In connection with a separate incident, the indictment charged Resto-Figueroa with drive-by-shooting murder in furtherance of a major drug offense in violation of 18 U.S.C. § 36(b)(2)(A) and with using a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A), (j)(1)-(2).

Velazquez-Fontanez, Resto-Figueroa, and Cotto-Andino were tried together. The jury returned guilty verdicts on every count against each defendant.[1] These timely appeals followed.

## II. DISCUSSION

We address defendants' appellate challenges to their convictions in the following order: (A) the defendants' sufficiency of the evidence arguments; (B) Cotto-Andino's evidentiary objections; (C) Resto-Figueroa's mistrial motion; (D) Resto-Figueroa's instructional error claims; and (E) Velazquez-Fontanez's and Resto-Figueroa's challenges to the district court's responses to questions asked by the jury during its deliberations.

## A. Sufficiency of the Evidence

Each defendant timely moved pursuant to Fed. R. Crim. P. 29 to challenge the sufficiency of the evidence against him. Reviewing de novo the denial of these motions, see United States v. Millán-Machuca, 991 F.3d 7, 17 (1st Cir. 2021), we view the trial record in the light most favorable to the verdict and draw all reasonable inferences in the verdict's favor, see United States v. Meléndez-González, 892 F.3d 9, 17 (1st Cir. 2018). Our task is to determine "whether 'any rational trier of fact could have found

---

[1] Both Velazquez-Fontanez and Resto-Figueroa were also charged with and convicted of an additional section 924(c) count, but those convictions were subsequently dismissed.

the essential elements of the crime beyond a reasonable doubt.'" United States v. Bailey, 405 F.3d 102, 111 (1st Cir. 2005) (quoting United States v. Henderson, 320 F.3d 92, 102 (1st Cir. 2003)).

Unlike his two co-defendants, Cotto-Andino challenges several of the district court's evidentiary rulings. When we review those rulings in a later section, we adopt a "balanced" approach, "objectively view[ing] the evidence of record." United States v. Amador-Huggins, 799 F.3d 124, 127 (1st Cir. 2015) (quoting United States v. Burgos-Montes, 786 F.3d 92, 99 (1st Cir. 2015)). For now, though, we present the facts relevant to Cotto-Andino's sufficiency challenge in the light most favorable to the verdict.

## 1.  18 U.S.C. § 1962(d)

The Racketeer Influenced and Corrupt Organizations Act makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). The elements of a substantive RICO offense consist of "(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity." Salinas v. United States, 522 U.S. 52, 62 (1997). RICO also makes it "unlawful for any person to conspire to" commit a substantive RICO offense. 18 U.S.C. § 1962(d). To prove a RICO

conspiracy offense, the government must show that "the defendant knowingly joined the conspiracy, agreeing with one or more coconspirators 'to further [the] endeavor, which, if completed, would satisfy all the elements of a substantive [RICO] offense.'" United States v. Rodríguez-Torres, 939 F.3d 16, 23 (1st Cir. 2019) (alterations in original) (quoting Salinas, 522 U.S. at 65).

Unsurprisingly, none of the defendants contends that the government failed to prove the existence of a far-ranging RICO enterprise and conspiracy. Eyewitness testimony described in detail the rise of La Rompe as a coordinated and hierarchal organization, with members bound together by shared hand signals, meetings, drug distribution, and the use of violence to maintain power and control over drug points in the face of competition from La ONU. Each defendant challenges instead the sufficiency of the proof that he was a member of that RICO conspiracy.

The Supreme Court has made clear that holding a particular person responsible for the acts of a RICO conspiracy does not require the government to prove that that person committed or even agreed to commit two or more racketeering acts. See Salinas, 522 U.S. at 65. Rather, "the government's burden . . . is to prove that the defendant agreed that at least two acts of racketeering would be committed in furtherance of the conspiracy." Millán-Machuca, 991 F.3d at 18 (quoting United States v.

- 7 -

<u>Leoner-Aguirre</u>, 939 F.3d 310, 317 (1st Cir. 2019), <u>cert. denied</u>, 140 S. Ct. 820 (2020)).[2]

So, for each defendant, we ask whether the government presented evidence from which a reasonable jury could have concluded that each defendant knowingly agreed that at least two racketeering acts would be committed in furtherance of La Rompe's ends.

### a. Cotto-Andino

Three cooperating witnesses testified that Cotto-Andino controlled La Rompe's drug point at the Jardines de Cupey public-housing facility, and two of those three also testified that Cotto-Andino ran La Rompe's drug point at the Brisas de Cupey public-housing facility. To avoid attracting the attention of the police, Cotto-Andino delegated day-to-day responsibility for

---

[2] This court has on occasion stated that a RICO conspiracy conviction requires proof that a defendant agreed to commit, or in fact committed, two or more predicate offenses. <u>See</u> <u>United States v. Ramírez-Rivera</u>, 800 F.3d 1, 18 (1st Cir. 2015); <u>United States v. Shifman</u>, 124 F.3d 31, 35 (1st Cir. 1997); <u>United States v. Hurley</u>, 63 F.3d 1, 8-9 (1st Cir. 1995); <u>Libertad</u> v. <u>Welch</u>, 53 F.3d 428, 441 (1st Cir. 1995); <u>Aetna Cas. Sur. Co.</u> v. <u>P & B Autobody</u>, 43 F.3d 1546, 1561 (1st Cir. 1994); <u>Miranda</u> v. <u>Ponce Fed. Bank</u>, 948 F.2d 41, 47-48 (1st Cir. 1991); <u>Feinstein</u> v. <u>Resol. Tr. Corp.</u>, 942 F.2d 34, 41 (1st Cir. 1991); <u>United States</u> v. <u>Boylan</u>, 898 F.2d 230, 241 (1st Cir. 1990); <u>United States</u> v. <u>Torres Lopez</u>, 851 F.2d 520, 528 (1st Cir. 1988); <u>United States</u> v. <u>Angiulo</u>, 847 F.2d 956, 964 (1st Cir. 1988); <u>United States</u> v. <u>Winter</u>, 663 F.2d 1120, 1136 (1st Cir. 1981). We more recently made clear that those statements are inconsistent with the Supreme Court's 1997 holding in <u>Salinas</u>. <u>See</u> <u>Leoner-Aguirre</u>, 939 F.3d at 317; <u>Millán-Machuca</u>, 991 F.3d at 18 n.3; <u>United States</u> v. <u>Sandoval</u>, No. 18-1993, 2021 WL 2821070, at *3 n.1 (1st Cir. July 7, 2021). We follow, as we must, <u>Salinas</u>.

running the Jardines de Cupey drug point to the Morales Castro brothers, known as Nestor and Bimbo. In return, Nestor and Bimbo paid Cotto-Andino a portion of the drug point's proceeds -- referred to as "rent" or a "ticket." Cotto-Andino made a similar arrangement with Nestor and Bimbo for the Brisas de Cupey drug point. In addition to interacting with Cotto-Andino, Nestor and Bimbo also attended meetings with La Rompe's supreme leader, "Mayito."

Given La Rompe's raison d'être, i.e., to provide revenue from drug sales for its leaders, Cotto-Andino's control of two La Rompe drug points provided ample evidence that he had agreed that drugs would be repeatedly sold in furtherance of La Rompe's conspiracy. Indeed, this evidence placed him at or at least near the heart of the conspiracy.

Cotto-Andino points to evidence establishing an alternative explanation for his admitted involvement at or near the drug points, i.e., he worked lawfully as a construction contractor on jobs in Jardines de Cupey and Brisas de Cupey. For purposes of our sufficiency analysis, however, we can presume that the jury rejected that view of his conduct in favor of witness testimony identifying Cotto-Andino, Nestor, and Bimbo as leaders of La Rompe and its drug trafficking operation in Jardines de Cupey and Brisas de Cupey. See, e.g., United States v. Nueva, 979 F.2d 880, 884 (1st Cir. 1992) (explaining that an appellate court will

not disturb a jury verdict "simply because the defense posited a story at odds with that of the government"). Cotto-Andino alternatively argues that the evidence did not establish that he knowingly participated in an overarching conspiracy involving La Rompe, as opposed to a smaller, independent conspiracy with Nestor and Bimbo. But, when viewed favorably to the verdict, the evidence was sufficient to bely any notion that there existed an independent drug point in La Rompe's territory.

### b. Velazquez-Fontanez

Velazquez-Fontanez served as a municipal police officer in San Juan. He supplied guns and ammunition to La Rompe members, including his brother, Bebo, a La Rompe enforcer who ran several drug points. When Bebo was incarcerated in 2011, Velazquez-Fontanez helped manage Bebo's drug points. Velazquez-Fontanez delivered packages of marijuana and cocaine to Quija, a "runner" who moved drugs to and from one of Bebo's drug points. Velazquez-Fontanez transported drug point proceeds as well.

The testimony of two cooperating witnesses -- Luis Ivan Yanyore-Pizarro and Oscar Calviño-Acevedo -- also implicated Velazquez-Fontanez in a drive-by shooting. On June 25, 2011, while he was in jail, Bebo used a contraband cell phone to call Quija. Bebo told Quija to go to a business in Caimito (one of San Juan's subdivisions) and kill five men present there, one of whom was

known as Prieto-Pincho.  Bebo wanted Prieto-Pincho dead because he took control of several of Bebo's drug points.  Later that evening, Velazquez-Fontanez called Quija and told him that Prieto-Pincho and his men were outside of the business washing their cars.  After one of La Rompe's leaders gave the green light to kill Prieto-Pincho and his men, several members of La Rompe, including Yanyore-Pizarro and Calviño-Acevedo, drove toward the business.  As they approached their destination, Yanyore-Pizarro called Velazquez-Fontanez, who confirmed that the men were there and that Prieto-Pincho was "the big guy, who's the one who is speaking over the phone."  Yanyore-Pizarro responded that he "already s[aw] them," told Velazquez-Fontanez to "listen to the show," and kept the phone line open as the men exited the car and opened fire, killing Prieto-Pincho and three others.  The next day, Velazquez-Fontanez saw Yanyore-Pizarro in person and told Yanyore-Pizarro that "that sounded awesome" and that "the part [that Velazquez-Fontanez] liked the most was when the rifle continued shooting at the end."

Velazquez-Fontanez argues that the shooting on June 25, 2011, cannot support his RICO conspiracy conviction because it was solely motivated by Bebo's personal desire for revenge against Prieto-Pincho.  The jury was entitled to reject this account and instead credit the government's evidence that the shooting was carried out to further La Rompe's ends.  So, too, was the jury

- 11 -

free to reject Velazquez-Fontanez's argument that he was not guilty because he had a legitimate job as a police officer and was legally permitted to own weapons and ammunition.

Velazquez-Fontanez next points out that some witnesses who cooperated with the government did not identify him as a member of La Rompe. But even the uncorroborated testimony of a single cooperating witness may be sufficient to support a conviction, so long as the testimony is not facially incredible. See United States v. Cortés-Cabán, 691 F.3d 1, 14 (1st Cir. 2012) (collecting cases). Here, multiple witnesses described Velazquez-Fontanez's participation in La Rompe's criminal activities; it matters not for purposes of our sufficiency review that others did not do so.

Velazquez-Fontanez also asserts that the cooperating witnesses' testimony implicating him in La Rompe's activities should not have been admitted because it was inadmissible hearsay not subject to the co-conspirator exception. See generally United States v. García-Torres, 280 F.3d 1 (1st Cir. 2002). He notes a few instances where witnesses testified about out-of-court statements by Bebo and Quija. But he makes no attempt to explain how these statements were not in furtherance of the conspiracy or why the evidence that he transported guns, money, and drugs for Bebo and Quija does not show that all three belonged to the same conspiracy. See, e.g., United States v. Piper, 298 F.3d 47, 52 (1st Cir. 2002) (conditioning the admission of statements in

furtherance of a conspiracy under Fed. R. Evid. 801(d)(2)(E) on the introduction of "extrinsic evidence . . . sufficient to delineate the conspiracy and corroborate the declarant's and the defendant's roles in it").  This lack of development dooms his argument.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Finally, Velazquez-Fontanez argues that a conspiracy to commit a controlled substance offense in violation of section 846 cannot serve as a predicate offense for the RICO charge.  We see no reason to accept this argument.  The fact that section 846 limits its own object offenses simply does not suggest that a section 846 offense itself cannot be the object or predicate for another offense.  And Velazquez-Fontanez offers no other reason why a section 846 conspiracy cannot serve as the predicate or object for a RICO offense.[3]  See id.

In sum, there was ample and competent testimony which, if believed, directly tied Velazquez-Fontanez to La Rompe and established that he knew his fellow gang members would engage in at least two RICO predicate offenses.

---

[3]  Velazquez-Fontanez makes this same argument regarding his convictions under 18 U.S.C. § 36(b)(2) and 18 U.S.C. § 924(c)(1)(A), (j)(1)-(2).  We reject it in both instances for the same reason.

### c. Resto-Figueroa

The trial record supports Resto-Figueroa's RICO conspiracy conviction as well. Cooperating witnesses testified that Resto-Figueroa was a La Rompe enforcer who carried firearms, sold marijuana and crack cocaine for the gang, and stored its weapons at his home.

Cooperator testimony also implicated Resto-Figueroa in a drive-by shooting that ended an intra-gang feud. The feud began when Pollo, a La Rompe member, killed another member over a dispute about payment for marijuana. The slain member's brother, Oreo, obtained permission from La Rompe's leaders to kill Pollo. Oreo then enlisted Resto-Figueroa and several other La Rompe members to assist with the killing. On August 28, 2012, members dressed up as police officers and drove SUVs equipped with tinted windows, police lights, and sirens away from Resto-Figueroa's house to Pollo's neighborhood, the Jardines de Cupey housing project. After their mock police raid of Pollo's apartment turned up nothing, Resto-Figueroa and the others drove through the housing project until they spotted Pollo on the street. Some men in the SUVs opened fire on Pollo, and others, including Resto-Figueroa, exited the SUVs and began running toward Pollo. By the time that Resto-Figueroa reached Pollo, Pollo was dead. After the shooting, the men returned to the SUVs and drove to Resto-Figueroa's house.

Resto-Figueroa asserts that this evidence did not establish his knowing participation in La Rompe's enterprise. At most, he contends, the evidence establishes a smaller conspiracy in which he was brought in as an "outside contractor" to kill Pollo. Resto-Figueroa's account downplays evidence of the extent of his connection to La Rompe, specifically his drug selling and storage of La Rompe weaponry. That evidence of Resto-Figueroa's sustained and knowing connection to La Rompe's activities provides ample support for a rational jury's conclusion that Resto-Figueroa agreed to join the charged RICO conspiracy with knowledge that at least two racketeering acts would be committed.

In challenging the evidence's sufficiency, Resto-Figueroa also argues that one prominent La Rompe member-turned-cooperator -- Yanyore-Pizarro -- did not mention Resto-Figueroa and another -- Calviño-Acevedo -- is unworthy of credence. These contentions miss the mark on appeal because they go to the evidence's weight and credibility, not its sufficiency. See, e.g., United States v. Noah, 130 F.3d 490, 494 (1st Cir. 1997).

\* \* \*

In sum, the evidence against all three defendants was sufficient to support their RICO conspiracy convictions.

## 2. 21 U.S.C. § 846

All three defendants were also convicted of conspiring to possess with intent to distribute controlled substances within 1,000 feet of a public-housing facility. See 21 U.S.C. §§ 841(a), 846, 860. To prove this offense, the government had to establish the existence of a conspiracy to possess cocaine, crack cocaine, heroin, and/or marijuana with intent to distribute it within 1,000 feet of a protected area, such as real property comprising a housing facility owned by a public housing authority, and that the defendant knowingly and willfully joined in that conspiracy. Id. §§ 841(a), 846, 860. Each defendant offers a slightly different argument for why the proof of such a conspiracy was insufficient as to him. We review each set of arguments in turn.

### a. Cotto-Andino

In challenging his section 846 conspiracy conviction, Cotto-Andino repurposes his contention that the government proved only a small conspiracy (among him, Nestor, and Bimbo). We have already explained why this argument fails. See supra Part II.A.1.a.

### b. Velazquez-Fontanez

Velazquez-Fontanez argues that his conviction cannot stand because he did not sell drugs for the conspiracy. But, taken in the light most favorable to the verdict, the evidence established that Velazquez-Fontanez furthered the drug

conspiracy's activities by couriering proceeds and drugs between members. And, despite its lack of corroboration through photo, video, or phone record evidence, the testimony of the cooperating witnesses, reviewed above in Part II.A.1.b, provided adequate proof of his involvement in a conspiracy to possess drugs for distribution. See Cortés-Cabán, 691 F.3d at 14.

### c. Resto-Figueroa

Resto-Figueroa argues that the evidence did not establish that he knowingly participated in La Rompe's drug-trafficking conspiracy. But, as we have already noted, see supra Part II.A.1.c, a rational jury viewing the evidence could have concluded that Resto-Figueroa's sales of drugs and joint activity with La Rompe members show that he was a knowing participant in La Rompe's drug conspiracy, not just a "hired gun."

### 3. 18 U.S.C. § 36(b)(2)

Both Velazquez-Fontanez and Resto-Figueroa were convicted of violating 18 U.S.C. § 36(b)(2)(A). That statute imposes penalties on any person who, "in furtherance . . . of a major drug offense and with the intent to intimidate, harass, injure, or maim, fires a weapon into a group of two or more persons and who, in the course of such conduct, kills any person," where the killing "is a first degree murder." 18 U.S.C. § 36(b)(2)(A). One who aids or abets another in the commission of a crime may be punished as a principal. 18 U.S.C. § 2.

- 17 -

### a. Velazquez-Fontanez

A reasonable jury could have concluded that Velazquez-Fontanez aided and abetted the drive-by shooting of Prieto-Pincho and others. The government presented evidence that Velazquez-Fontanez directed La Rompe members to the location where Prieto-Pincho and four other people could be found and described Prieto-Pincho's appearance. See supra Part II.A.1.b. A reasonable jury could have inferred that Velazquez-Fontanez did so to facilitate Prieto-Pincho's murder, which La Rompe's leaders ordered at the request of Velazquez-Fontanez's brother. And that inference becomes stronger when the foregoing evidence is considered alongside testimony that Velazquez-Fontanez listened to and later expressed approval of the shooting.

According to Velazquez-Fontanez, other members of La Rompe made the plans to kill Prieto-Pincho and his associates, and the evidence did not establish a connection between those plans and Velazquez-Fontanez's words and actions. The evidence that he spoke to the shooters, he argues, does not establish that he did anything more than "answer[] a call made by Yanyore-Pizarro." Velazquez-Fontanez essentially asks us to disregard our obligation to draw all reasonable inferences in the verdict's favor. See Meléndez-González, 892 F.3d at 17. That deferential standard of review, as applied here, leads to the conclusion that the evidence adequately supported the verdict. And Velazquez-Fontanez errs in

claiming that the government's reliance on cooperating witness testimony necessarily undermines the sufficiency of the evidence. See Cortés-Cabán, 691 F.3d at 14.

Velazquez-Fontanez also argues that the government failed to prove that a weapon was fired. This contention is meritless. By returning a general verdict that Velazquez-Fontanez was guilty beyond a reasonable doubt of aiding and abetting a drive-by shooting in violation of section 36(b)(2)(A), the jury necessarily found that a person "fire[d] a weapon into a group of two or more persons." The evidence establishing this element was overwhelming.

#### b. Resto-Figueroa

A reasonable jury could have likewise concluded that Resto-Figueroa aided and abetted the drive-by shooting of Pollo and others on August 28, 2012. As described above, see supra Part II.A.1.c, ample witness testimony established that Resto-Figueroa, along with others, traveled to Jardines de Cupey to find and kill Pollo.

Resto-Figueroa's initial challenge to his drive-by shooting conviction proceeds from a mistaken premise. He asserts that he did not act with the requisite enterprise motive to be convicted of a violent crime in aid of racketeering. See 18 U.S.C. § 1959(a) (punishing certain crimes committed "for the purpose of gaining entrance to or maintaining or increasing position in an

- 19 -

enterprise engaged in racketeering activity"). But Resto-Figueroa was not charged with an offense under section 1959. To the extent that Resto-Figueroa's brief may be read to challenge the sufficiency of the evidence that the drive-by shooting was "in furtherance . . . of a major drug offense," 18 U.S.C. § 36(b)(2), this argument also fails. As described above, La Rompe's leaders authorized Pollo's killing to settle an intra-gang feud. A reasonable jury could have found that Resto-Figueroa intended to further La Rompe's drug-trafficking activity by helping Oreo kill Pollo. Finally, Resto-Figueroa's argument that the government's witnesses lacked credibility falls flat on sufficiency review. See Noah, 130 F.3d at 494.

For these reasons, sufficient evidence supported the drive-by shooting convictions of Velazquez-Fontanez and Resto-Figueroa.

### 4. 18 U.S.C. § 924(c)

Based on the predicate offense of a drive-by shooting murder in violation of section 36(b)(2)(A), Velazquez-Fontanez was convicted of aiding and abetting the use of a firearm during and in relation to a crime of violence.[4]  See 18 U.S.C. § 924(c)(1)(A).

---

[4]  Resto-Figueroa was also convicted of a section 924(c) offense predicated on a violation of section 36(b)(2)(A). Apart from his challenge to his conviction for the predicate offense, see supra Part II.A.3.b, Resto-Figueroa does not challenge his section 924(c) conviction on appeal.

A "crime of violence" is defined as a felony offense that either "(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another," (the "elements clause") or "(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense" (the "residual clause").  18 U.S.C. § 924(c)(3)(A)-(B).  Because United States v. Davis held that the residual clause was unconstitutionally vague, a felony offense must qualify under the elements clause to serve as a predicate offense for a conviction for use of a firearm during and in relation to a crime of violence. 139 S. Ct. 2319, 2336 (2019).  Velazquez-Fontanez claims that Davis undermines his section 924(c) conviction because his section 36(b)(2)(A) predicate offense does not satisfy the elements clause.

Davis does not help Velazquez-Fontanez.  To assess whether a violation of section 36(b)(2)(A) satisfies the elements clause, we apply the categorical approach, "consider[ing] the elements of the crime of conviction, not the facts of how it was committed, and assess[ing] whether violent force is an element of the crime."  United States v. Cruz-Rivera, 904 F.3d 63, 66 (1st Cir. 2018) (quoting United States v. Taylor, 848 F.3d 476, 491

(1st Cir. 2017)). The language of section 36(b)(2)(A)[5] easily satisfies section 924(c)(3)'s elements clause. The act of "fir[ing] a weapon" involves the use of violent force. See Johnson v. United States, 559 U.S. 133, 140 (2010) (defining "physical force" as "force capable of causing physical pain or injury to another person"); United States v. Edwards, 857 F.3d 420, 426 (1st Cir. 2017) (remarking that it would be "absurd[]" to conclude that "'pulling the trigger on a gun' involves no '"use of force" because it is the bullet, not the trigger, that actually strikes the victim'" (quoting United States v. Castleman, 572 U.S. 157, 171 (2014))). And a violator of section 36(b)(2) must undertake that violent force "with the intent to intimidate, harass, injure, or maim," satisfying the elements clause's mens rea requirement. See United States v. García-Ortiz, 904 F.3d 102, 108-09 (1st Cir. 2018) (explaining that a general intent crime satisfies section 924(c)(3)(A)'s mens rea requirement); see also Borden v. United States, 141 S. Ct. 1817, 1826 (2021) (plurality opinion) (observing that ACCA's elements clause "obvious[ly]" applies to "[p]urposeful" forceful conduct). For these reasons,

---

[5] Section 36(b)(2)(A) imposes penalties on any person who, "in furtherance . . . of a major drug offense and with the intent to intimidate, harass, injure, or maim, fires a weapon into a group of two or more persons and who, in the course of such conduct, kills any person . . . if the killing . . . is a first degree murder."

Velazquez-Fontanez's section 36(b)(2)(A) offense meets the requirements of section 924(c)(3)'s elements clause.

## B. Cotto-Andino's Evidentiary Objections

We consider next several related challenges by Cotto-Andino to the district court's evidentiary rulings. When a defendant preserves an objection, we generally review a district court's evidentiary ruling for abuse of discretion. See United States v. Appolon, 715 F.3d 362, 371 (1st Cir. 2013). A harmless evidentiary error does not require reversal. See Kotteakos v. United States, 328 U.S. 750, 765 (1946).

This court reviews challenges related to the enforcement of subpoenas under the Sixth Amendment's Compulsory Process Clause for abuse of discretion. See United States v. DeCologero, 530 F.3d 36, 74-75 (1st Cir. 2008).[6] A defendant's conviction will stand if a non-structural constitutional error "was harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24 (1967).

### 1. Uncharged Murder Evidence

As part of its case-in-chief, the government presented the testimony of Oscar Calviño-Ramos, a cooperating witness. He

---

[6] But see United States v. Galecki, 932 F.3d 176, 184-85 (4th Cir. 2019) ("With regard to compulsory process claims, our sister circuits apply both de novo and abuse of discretion standards of review, even at times applying different standards within the same circuit without explanation.").

asserted that Cotto-Andino killed Cano Ingram -- a rival drug dealer -- and Carlos Tomate -- someone who had previously forced Cotto-Andino out of a housing project. In support of the assertion that Cotto-Andino murdered Cano Ingram, Calviño-Ramos claimed that Cotto-Andino said in 1995 that he would kill Cano Ingram if he had any problems with him, and that the killing took place in 1995 or 1996. According to the government, the two killings allowed Cotto-Andino to consolidate power over drug points in the Jardines de Cupey and Brisas de Cupey housing projects.

Cotto-Andino timely objected to this evidence as improper character evidence offered only to suggest that Cotto-Andino was a very bad guy. See Fed. R. Evid. 404(b)(1). The government, though, pointed out that the evidence provided important and properly relevant proof of how Cotto-Andino came to be in a position to demand and receive a percentage of the sales proceeds from two La Rompe drug points. See Fed. R. Evid. 404(b)(2). This theory of relevance did not rely on any claim of propensity, either explicitly or implicitly, see United States v. Henry, 848 F.3d 1, 15 (1st Cir. 2017) (Kayatta, J., concurring). Rather, it was the government's attempt to provide an origin story to show how Cotto-Andino came to be in a position to exact "rent" from Nestor and Bimbo for sales from those two drug points, the allegation central to the government's RICO and drug distribution conspiracy charges against Cotto-Andino. In

this sense, the evidence was like the scenes of De Niro's young Vito Corleone in The Godfather Part II, explaining how Brando's Don Vito was in the position of power in which the viewer found him at the beginning of The Godfather.

This properly relevant evidence by its nature reflected poorly on Cotto-Andino's character, obligating the district court to balance its probative value against the potential for unfair prejudice. Fed. R. Evid. 403; United States v. Rodríguez-Berríos, 573 F.3d 55, 64 (1st Cir. 2009). But we see no abuse of discretion in the district court's balancing analysis. The evidence provided an important rebuttal to Cotto-Andino's defense that he associated innocently with La Rompe members or was merely present at its drug points. As to the murder of Cano Ingram in particular, Calviño-Ramos's testimony relied in part on a threat allegedly made by Cotto-Andino himself, a party admission carrying significant probative force. Cf. United States v. Ford, 839 F.3d 94, 110 (1st Cir. 2016) (questioning whether evidence with "negligible probative value" should have been excluded pursuant to Rule 403). And the district court took the precaution of telling the jurors that they "may not use this evidence to infer that, because of his character, he carried out the acts charged in this case." See United States v. Pelletier, 666 F.3d 1, 6 (1st Cir. 2011) (observing that limiting instructions can cabin unfair prejudice).

Of course, the admission of evidence that Cotto-Andino had killed two people to acquire control of two drug points opened the door to any reasonable rebuttal. Cotto-Andino relied on cross-examination alone to challenge the testimony about Carlos Tomate's death, but he sought to rebut the allegation that he killed Cano Ingram by proffering a witness and some records indicating that Cano Ingram was alive until 2001. Specifically, Cotto-Andino sought to call Jose Franco-Rivera, an attorney, as a witness to testify that from 1997 to 1998, he represented a person indicted for robbery under the name of "Antonio Vazquez-Pagan, also known as Cano Ingram." In the alternative, Cotto-Andino asked the court to take judicial notice of a published opinion that referred to the lawyer's client as "Cano Ingram." He also sought to introduce a death certificate indicating that Vazquez-Pagan died on March 29, 2001.

After holding a Rule 104 hearing, the district court concluded that the relevance of the proffered evidence hinged on an insufficiently proven assumption that there were not two Cano Ingrams -- one who was killed in the mid-90s by Cotto-Andino and one who died in 2001. See Fed. R. Evid. 104(b) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist."). The district court observed that there was no evidence that Vazquez-Pagan a/k/a Cano Ingram was engaged in drug sales or

was active in Jardines de Cupey.  The district court added that admitting the evidence might "confuse the jurors."  See Fed. R. Evid. 403.

Seeking more support for his assertion that Antonio Vazquez-Pagan and the person identified as Cano Ingram by Calviño-Ramos were one and the same, Cotto-Andino served a subpoena on the Criminal Investigation Corps of the Commonwealth of Puerto Rico.  The subpoena sought "[a]ll booking and criminal profiling documentation regarding Antonio Vazquez-Pagan," which Cotto-Andino expected to yield a criminal dossier containing Vazquez-Pagan's aliases, addresses, and information about criminal conduct.  When the custodian of records did not appear pursuant to the subpoena, the district court declined to enforce it, expressing doubt that the documents produced would be admissible under any hearsay exception or relevant absent proof that there were not two Cano Ingrams.  The net result was that the district court precluded Cotto-Andino's effort to cast doubt on the government's claim that he killed Cano Ingram.

The government would have us view the excluded evidence as bearing on only a side-show debate about the timing of Cano Ingram's death that could not properly be explored through extrinsic evidence.  Not so.  Proof that the person identified by Calviño-Ramos as Cano Ingram was alive for five to six years after Cotto-Andino supposedly killed him would have called into question

the very claim that Cotto-Andino killed Cano Ingram. And, in so doing, it would have cast doubt on a central pillar holding up the government's origin story and Calviño-Ramos's testimony as a whole.[7]

So we turn our attention to the reasons given by the district court for excluding the proffered evidence. District courts "have wide discretion in deciding whether an adequate foundation has been laid for the admission of evidence." Veranda Beach Club Ltd. P'ship v. W. Sur. Co., 936 F.2d 1364, 1371 (1st Cir. 1991) (quoting Real v. Hogan, 828 F.2d 58, 64 (1st Cir. 1987)). Deference to that discretion is particularly apt here given the district court's greater understanding of the context for a dispute about the prevalence in Puerto Rico of a nickname such as Cano Ingram.[8] And, in finding that Cotto-Andino had failed to show that the two witnesses were testifying about the same person, the district court reasonably emphasized Vazquez-Pagan's lack of demonstrated connections to Jardines de Cupey and the discrepancy in suspected criminal activity. So we may assume (without deciding) that the district court did not abuse its discretion in finding that Cotto-Andino's proffered evidence did

---

[7] Nor would Fed. R. Evid. 608(b) bar the evidence's introduction because it was not offered to prove a specific instance of Calviño-Ramos's conduct.

[8] The parties tell us that "Cano Ingram" combines a term for a blond man and the common name for a type of firearm.

not reliably establish that Antonio Vazquez-Pagan was the same person described in Calviño-Ramos's testimony, at least based on the existing record before the district court when it ruled.

More problematic is the district court's refusal to aid Cotto-Andino's effort to add to that record by obtaining information about Vazquez-Pagan's aliases, addresses, and criminal activity. Under the Sixth Amendment's Compulsory Process Clause, a defendant has "the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." Pennsylvania v. Ritchie, 480 U.S. 39, 56 (1987). By refusing to enforce the subpoena, the district court denied Cotto-Andino the opportunity to provide the links that the district court found to be missing in its Rule 104(b) ruling.

To be sure, Cotto-Andino does "not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor v. Illinois, 484 U.S. 400, 410 (1988). But given the significance of Cano Ingram's death to the government's case against Cotto-Andino, the district court too readily assumed that none of the subpoenaed records would provide admissible evidence corroborating Franco-Rivera's proposed testimony and supporting

Cotto-Andino's effort to contradict Calviño-Ramos's testimony.[9] Indeed, Cotto-Andino's subpoena sought booking information, a type of evidence that the government may offer in criminal cases when it consists of "ministerial, non-adversarial information." See United States v. Dowdell, 595 F.3d 50, 72 (1st Cir. 2010); Fed. R. Evid. 803(8)(A)(ii). If the subpoena yielded information suggesting that Vazquez-Pagan was the Cano Ingram to whom Calviño-Ramos had referred, that would have eliminated any concern about the defense evidence under Rule 104(b). Nor can we agree that the evidence would have confused the jury unless we were to say -- incorrectly -- that casting reasonable doubt on the central thrust of testimony by a government witness equates to creating impermissible confusion. See United States v. Collorafi, 876 F.2d 303, 306 (2d Cir. 1989) (explaining that "[a] mere statement that evidence would be confusing is not enough" to justify exclusion on Rule 403 grounds because "factual controversy breeds confusion"); United States v. Evans, 728 F.3d 953, 966 (9th Cir. 2013) (observing that an "increased . . . chance[] that the jury would acquit" cannot be attributed to jury confusion without "prejudg[ing] the 'correct' outcome of the trial before it occurs").

---

[9] The government's brief on appeal does not identify any reason why the proffered evidence or the subpoenaed records would be inadmissible as hearsay not subject to any exception.

Importantly, aside from pointing out the already-mentioned gaps in Franco-Rivera's testimony, the government provided no information tending to negate the assertion that Vazquez-Pagan and Cano Ingram were one and the same. And it seems most likely that the government and its witness could have proved that there were two Cano Ingrams much more easily than Cotto-Andino could have proven the opposite, especially without enforcement of the subpoena.

For the foregoing reasons, we conclude that, because the district court exercised its discretion to preclude the proffered evidence of Cano Ingram's 2001 death as dependent on an unproven fact, the district court erred in then refusing to enforce a subpoena reasonably calculated to prove that fact. The remaining question is whether the government has shown that the error was harmless beyond a reasonable doubt. See Chapman, 386 U.S. at 24.

We think not. The case against Cotto-Andino was strong, but not overwhelming given its heavy dependence on cooperating witnesses. See United States v. Wright, 937 F.3d 8, 31 (1st Cir. 2019) (observing, in the constitutional-error context, that cooperating-witness evidence "is rarely deemed to be overwhelming on its own"). Calviño-Ramos's allegation that Cotto-Andino was a murderer was, if believed, a big deal that operated on two levels: It made it more plausible that Cotto-Andino had the control and reputation necessary to play the role alleged in the conspiracy,

- 31 -

and it painted him as a bad guy. The government convinced the district court -- and this court -- that the obvious and substantial prejudice inherent in evidence that Cotto-Andino murdered someone did not substantially outweigh its proper relevance. But that very success places the government in a weak position in claiming now that the evidence that Cotto-Andino was precluded from rebutting was of no substantial moment.

We faced an analogous situation in United States v. Rosario-Pérez, 957 F.3d 277 (1st Cir. 2020). There, the government successfully secured the admission of an allegation that the defendant had committed an uncharged murder. Id. at 289. When the defendant then sought to counter that allegation, the trial court erroneously excluded the exculpatory evidence. Id. at 290-94. We found such an exclusion to be cause for vacating the verdict, reasoning that "to allow evidence that [the defendant] murdered [a drug seller indebted to him] and disallow plausible evidence that he did not based on erroneous rulings is an unacceptable result." Id. at 294.

For similar reasons, we cannot deem harmless the district court's decision to deny Cotto-Andino the opportunity to gather and present evidence to rebut Calviño-Ramos's allegation. By cutting off Cotto-Andino's efforts to gather evidence relevant to establishing when Cano Ingram died, the district court undercut the defendant's attempt to kill three birds with one stone:

Cotto-Andino did not kill Cano Ingram, Calviño-Ramos is a liar, and the government has not explained how Cotto-Andino could have possessed the role in La Rompe alleged by the government.

In sum, the district court's constraint of Cotto-Andino's attempt to rebut the government's uncharged murder evidence exceeded the bounds of the court's discretion, was not harmless, and requires vacatur of Cotto-Andino's convictions.

## 2. Flight Evidence

Cotto-Andino also argues that evidence that he fled to avoid arrest should have been excluded. Over Cotto-Andino's objection, Elvin Cruz-Castro testified that Cotto-Andino came to Cruz-Castro's home in Hallandale Beach, Florida, in April 2016 and told Cruz-Castro that "he needed a place to stay for a few days because he was being wanted by the authorities." Two days after Cotto-Andino arrived at Cruz-Castro's home, federal agents arrested Cotto-Andino.

Citing United States v. Benedetti, 433 F.3d 111 (1st Cir. 2005), Cotto-Andino argues the government did not "present sufficient extrinsic evidence of guilt to support an inference that [his] flight was not merely an episode of normal travel but, rather, the product of a guilty conscience related to the crime alleged." Id. at 116. He claims that his request to stay with Cruz-Castro is not indicative of a guilty conscience because Cotto-Andino moved to Florida in 2013, well before his indictment in

July 2015.  He also argues that the evidence should have been excluded under Rule 403.

Because this same evidentiary issue is likely to arise at any retrial, we consider this argument now.  In so doing, we review for abuse of discretion the district court's determinations that there existed a sufficient factual predicate to support an inference that the flight reflected consciousness of guilt of the alleged offense, see United States v. West, 877 F.3d 434, 438 (1st Cir. 2017), and that Rule 403 did not bar the flight evidence's admission, see id. at 439.

There was no abuse of discretion here.  The government presented evidence to support the inference that Cotto-Andino's consciousness of guilt of the alleged offenses prompted his travel to Cruz-Castro's home.  Multiple cooperating witnesses testified that Cotto-Andino controlled two La Rompe drug points.  That alleged criminal activity formed the basis of the July 2015 indictment against Cotto-Andino, and he was subject to arrest on that indictment when he contacted Cruz-Castro in April 2016. Cotto-Andino's own words establish that the authorities' pursuit motivated his request to stay with Cruz-Castro.  Cf. United States v. Candelaria-Silva, 162 F.3d 698, 705-06 (1st Cir. 1998) (emphasizing, among other evidence establishing requisite factual predicate for flight evidence's introduction, defendant's admission following arrest in Massachusetts that "he knew he was

- 34 -

wanted in Puerto Rico").  The district court reasonably found that this evidence could support the inference that Cotto-Andino's travel to Hallandale Beach reflected consciousness of guilt of the crimes alleged in the indictment.  See Benedetti, 433 F.3d at 117 (finding sufficient factual predicate based on evidence of defendant's unlawful firearm possession and broken promise to surrender voluntarily after indictment).  Cotto-Andino's presence in Florida prior to his indictment in July 2015 perhaps offered a basis for claiming that he sought to stay with Cruz-Castro several months later for purposes other than flight.  But it certainly did not compel such a finding given Cruz-Castro's testimony.

Cotto-Andino has not shown that the district court's Rule 403 balancing analysis inadequately accounted for his presence in Florida before April 2016.  Moreover, the district court prudently cautioned the jury that "there could be reasons . . . for defendant's actions that are fully consistent with innocence," reducing any risk of unfair prejudice.  See United States v. Fernández-Hernández, 652 F.3d 56, 70 n.11 (1st Cir. 2011) (noting that district court provided limiting instruction and finding no abuse of discretion).

### 3.  Gun Possession at Time of Arrest

Cotto-Andino next challenges the admission of evidence that he possessed a gun at the time of his arrest, arguing that it had no special relevance and, alternatively, that any probative

value it possessed was substantially outweighed by unfair prejudice. See Fed. Rs. Evid. 404(b), 403. It is not certain that this issue will arise again at any retrial. Moreover, its resolution depends in part upon an exercise of discretion in assessing both the proffered relevance and the potential prejudice in the context of the case as a whole. We therefore see little benefit to addressing the issue further beyond referring to our guidance tendered in Henry, 848 F.3d at 9.

### 4. Possession of Cell Phones at Time of Arrest

Finally, Cotto-Andino argues that the district court improperly permitted Jason Ruiz, an agent of the Bureau of Alcohol, Tobacco, and Firearms, to provide lay opinion testimony about the circumstances of Cotto-Andino's arrest. On direct examination, Ruiz testified that law enforcement found Cotto-Andino with three cell phones, two of which were flip phones. On cross-examination, Cotto-Andino asked Ruiz whether there was anything illegal, uncommon, or meaningful about having multiple cell phones. Over Cotto-Andino's objection, Ruiz testified on redirect that, based on his experience investigating narcotics cases, defendants often carry multiple cell phones and use flip phones as temporary "burner" phones to evade law enforcement efforts to track and intercept drug-related communications. Later in the trial, Eddie Vidal-Gil was qualified as an expert on drug trafficking based on his experience as a police officer. Vidal-Gil's testimony about

the possession of multiple cell phones and use of flip phones was essentially identical to Ruiz's testimony.

On appeal, the parties' briefing on this issue focused on whether Ruiz's lay opinion testimony was properly admitted pursuant to Fed. R. Evid. 701. That question is largely academic where, as here, a qualified expert witness gave substantially identical testimony. We have no reason to think that an expert would not provide similar testimony at any retrial. Nor do we have any reason to think that cross-examination of Ruiz at any retrial would invite such lay opinion testimony, as it arguably did here. Cf. United States v. Valdivia, 680 F.3d 33, 51 (1st Cir. 2012) (explaining that defendant challenging improper expert testimony "cannot earnestly question the government's attempt to re-forge inferential links that [the defendant] sought to sever" during preceding cross-examination). We therefore see no reason to say more now on this issue.

### C. Resto-Figueroa's Mistrial Motion

We turn now to Resto-Figueroa's argument that he was denied a fair trial because he relied to his detriment on an inaccurate grand jury transcript provided by the government. We review the district court's denial of a motion for a mistrial for "manifest abuse of discretion." United States v. Chisholm, 940 F.3d 119, 126 (1st Cir. 2019) (quoting DeCologero, 530 F.3d at 52).

The transcript in question consists of grand jury testimony given by Oscar Calviño-Acevedo. As a tape recording of that testimony confirms, Calviño-Acevedo testified that Resto-Figueroa (known as "Tego") was one of the participants in the August 28 shooting of Pollo and others. This testimony was more or less identical to statements Calviño-Acevedo made previously, including in a trial based on the same indictment. The transcript of the grand jury testimony, however, erroneously used the nickname of another person, "Bebo," rather than "Tego."

When Calviño-Acevedo testified at trial that Tego was involved in the shooting, defense counsel began a line of cross-examination by asking whether Calviño-Acevedo told the grand jury that Tego was involved. Counsel went to sidebar where a long conversation ensued, during which defense counsel pointed to the transcript of Calviño-Acevedo's grand jury testimony. At that point, government counsel (who had conducted the grand jury questioning and who knew that Bebo had been incarcerated at the time of the shooting) realized that the grand jury transcript erroneously named Bebo rather than Tego. It also became apparent that counsel could get from the court reporter an audio tape of the pertinent grand jury testimony.

Counsel for Resto-Figueroa moved for a mistrial, contending that a misleading transcript had led him to adopt a trial strategy that now would backfire, making counsel rather than

the witness appear deceptive.  The district court denied the motion but allowed counsel to use the transcript to continue the cross-examination if he so wished.

When the sidebar conference concluded, Resto-Figueroa proceeded with cross-examination.  He asked Calviño-Acevedo about the list of people who went to Jardines de Cupey, reading the names from the grand jury transcript that did not include Tego. Calviño-Acevedo said those were the names he provided, but he insisted that he mentioned Tego, too.  After reviewing the grand jury transcript, Calviño-Acevedo agreed that the transcript did not include Tego's name.

The next day, while Calviño-Acevedo was still on the witness stand, the government produced a recording of his grand jury testimony.  Both Resto-Figueroa and the government agreed that the recording showed that Calviño-Acevedo had indeed mentioned Tego in his grand jury testimony.  Because Resto-Figueroa had probed the point on cross, the government sought to introduce the recording on redirect as a prior consistent statement admissible under Fed. R. Evid. 801(d)(1)(B).  Resto-Figueroa then renewed his mistrial motion, arguing that he would suffer prejudice because he relied in good faith on the disclosed grand jury transcript's accuracy.  The district court denied the motion.

Before the government conducted its redirect examination, the district court consulted the parties about a

special instruction to the jury.  The instruction explained that the grand jury transcript contained an error that had, until then, gone undetected, emphasized that Resto-Figueroa's counsel asked his initial questions "on a good-faith basis," and told the jury "not [to] make any adverse inferences against him or his client . . . because of that cross-examination that was held." Resto-Figueroa continued to press his request for a mistrial but assented to the instruction's wording.  The government then played the recording as part of its redirect examination.

Resto-Figueroa argues on appeal that he suffered acute prejudice from the transcript error because the government's case against him turned on the jury's evaluation of the credibility of cooperating witnesses with lengthy criminal records.  Rather than helping him exploit that potential vulnerability in the government's proof, Resto-Figueroa's reliance on the transcript ultimately underscored Calviño-Acevedo's inculpatory testimony when the government introduced the recording.

The district court did not abuse its discretion in denying Resto-Figueroa's motion for a mistrial.  Defense counsel learned that the transcript was likely in error before he used it to impeach the witness.  He can hardly cry foul about the district court then allowing the government to use the recording to rehabilitate the witness.  The district court informed the jury of the circumstances and carefully instructed against drawing any

adverse inferences against counsel based on his earlier cross-examination. Importantly, there is no evidence of any wrongdoing by the government. Neither counsel noticed the error in the transcript until sidebar, at which point government counsel brought it to the attention of the court and opposing counsel. This was, in short, one of the nettlesome surprises that can easily arise in a trial. To the extent the events played out to enhance Calviño-Acevedo's credibility as compared to that of defense counsel, they did so because defense counsel, aware of the likely error, pressed a strong attack that presumed there was no error. In sum, the transcript error does not present "extremely compelling circumstances" that would warrant reversal of the district court's denial of a mistrial in Resto-Figueroa's favor. United States v. Georgiadis, 819 F.3d 4, 16 (1st Cir. 2016) (quoting United States v. Freeman, 208 F.3d 332, 339 (1st Cir. 2000)).

### D. Instructional Error

Resto-Figueroa also argues that the jury instructions were erroneous in several ways. We address his arguments in turn.

Resto-Figueroa first claims the instructions did not require the jury to find that the alleged RICO enterprise actually existed or that the enterprise's activities actually affected interstate commerce. Instead, the instructions told the jury that the government need only prove that these elements "would" be satisfied. Resto-Figueroa did not object when these instructions

were given, so our review is for plain error.  Henry, 848 F.3d at 13.  The evidence that La Rompe existed and affected interstate commerce is so overwhelming that Resto-Figueroa cannot prove that the challenged "would" instructions caused any prejudice.  For that reason, we see no basis to upset the verdict based on this instruction, whether or not it was correct.  See Rodríguez-Torres, 939 F.3d at 35-36 (finding proof of La Rompe's existence so overwhelming as to render unprejudicial any potential error in similar instruction).

Next, Resto-Figueroa contends that the instructions did not require the jury to find actual association between the defendant and anyone involved with the enterprise.  This unpreserved argument also fails.  Read as a whole, the district court's charge required the jury to find that Resto-Figueroa associated with the enterprise with knowledge of its nature and its extension beyond his own role.[10]  See United States v. Gomez,

---

[10]  The district court explained that "a person is 'associated with' an enterprise when, for example, he joins with other members of the enterprise and he knowingly aids or furthers the activities of the enterprise, or he conducts business with or through the enterprise."  The district court later instructed the jury that "it is sufficient that the government prove beyond a reasonable doubt that at some time during the existence of the enterprise as alleged in the indictment, the conspirator was or would be 'employed by' or 'associated with' the enterprise within the meaning of those terms as I have just explained and that he knew or would know of the general nature of the enterprise, and knew or would know that the enterprise extended beyond his own role in the enterprise."

255 F.3d 31, 38 (1st Cir. 2001) (emphasizing that individual instructions "may not be evaluated in isolation"). The instruction given on association was not clearly erroneous.

Finally, Resto-Figueroa asserts for the first time on appeal that the instructions did not require the jury to find that a defendant knowingly joined a conspiracy to commit a substantive RICO violation. Resto-Figueroa cannot clear the plain error hurdle here. The district court told the jury that "the agreement to commit a RICO offense is the essential aspect of a RICO conspiracy offense" and gave an instruction on this issue that tracked Salinas.[11] See supra Part II.A.1. This instruction was not clearly erroneous.

### E. Responses to Jury Questions

During its deliberations, the jury used notes to communicate questions to the district court on three occasions. Upon receipt of each question, the district court informed counsel of the jury's message and gave them an opportunity to articulate their views regarding a proper response. See United States v. Sabetta, 373 F.3d 75, 78 (1st Cir. 2004) (describing best practices for responding to a jury's message).

---

[11] The district court explained that agreement could be shown by proof "beyond a reasonable doubt that the defendant agreed to participate in the enterprise with the knowledge and intent that at least one member of the RICO conspiracy (who could be, but need not be, the defendant himself) would commit at least two racketeering acts in conducting affairs of the enterprise."

First, the jury sent a note stating, "We, the jurors, request the witnesses' testimonies transcripts." Resto-Figueroa argued that the jurors have a right to request a read-back of the testimony and asked the district court to "inquire if they are asking for a read-back of the totality of the trial or just have a particular witness." Velazquez-Fontanez joined Resto-Figueroa's request. Cotto-Andino sought "a read-back of the testimony, sans sidebars and objections." The district court rejected these proposals, responding that: "You are to rely on your collective memory of the witnesses' testimonies. Transcripts are not evidence." Velazquez-Fontanez and Resto-Figueroa argue that the district court erred in doing so.

Our review is for abuse of discretion. United States v. Vázquez-Soto, 939 F.3d 365, 375 (1st Cir. 2019). We discern no abuse of discretion here. See United States v. Akitoye, 923 F.2d 221, 226 (1st Cir. 1991) (advising district courts facing similar requests to consider the scope of the jury's request; what obstacles, if any, would impair the request's fulfillment; and the amount of time the desired action would take). As the district court discussed with counsel on the record, the transcripts had not yet been completed. Moreover, any transcript would need to be redacted to exclude sidebar conversations between the district court and counsel. The jury specifically asked for transcripts of "the witnesses' testimonies." Another trial judge might well have

endeavored to see if their request might be greatly narrowed. On the other hand, such an attempt at a give-and-take with a twelve-member jury might itself have involved the court too much in the jury's deliberations, or perhaps itself taken much time. See United States v. Aubin, 961 F.2d 980, 983-84 (1st Cir. 1992) (finding no abuse of discretion in the district court's refusal to inform a jury that it could request a read-back based in part on concerns about "out-of-context testimony" and potential "difficulty agreeing to the scope of what should be read back"). In any event, a district court does not abuse its discretion by requiring the jury to proceed as most juries usually proceed. See Vázquez-Soto, 939 F.3d at 377 (observing that a jury "does not have the right to a rereading" of testimony (quoting Aubin, 961 F.2d at 983)).

Second, the jurors wrote: "[W]e, the jurors, request further clarification on what conspiracy means in Count Two. Also, does aiding and abetting apply to Count Two, Four and Five?" The district court responded to the jury by saying, "Please refer to Instruction Number 32 for clarification on what conspiracy means in Count Two. Aiding and abetting does not apply to Count Two. It applies to Counts Four and Five." In doing so, the district court declined Resto-Figueroa's request to "inquire further" of the jurors.

Velazquez-Fontanez argues that the district court's response regarding the meaning of conspiracy did not provide the clarification the jury requested. Resto-Figueroa adopts Velazquez-Fontanez's argument by reference, and he adds that the district court's RICO conspiracy instruction was "generally incomprehensible." We review for abuse of discretion a district court's decision on whether to give a supplementary jury instruction. See United States v. Monteiro, 871 F.3d 99, 114 (1st Cir. 2017).

The defendants did not object to or seek to modify the district court's initial conspiracy instruction. Nor did they suggest an alternative instruction that the district court should have provided in response to the note. Even where a defendant does offer an alternative, we typically do not fault a district court for declining to expand upon its "initial, entirely correct instructions" and instead "refer[ring] the jury to the original formulation." United States v. Roberson, 459 F.3d 39, 46 (1st Cir. 2006) (quoting Elliott v. S.D. Warren Co., 134 F.3d 1, 7 (1st Cir. 1998)). Defendants have not shown that the district court abused its discretion by sticking to the instruction given here without objection.

Third, the jurors wrote, "[W]e, the jurors, request further clarification on Instruction Number 44 regarding the meaning of being present." The government asserted that, although

it had agreed to the instruction, the instruction "is highly confusing" because its theory posited "that he was handling everything through phone." The government requested a supplementary instruction stating: "Presence does not require actual physical presence. Please refer to instruction on aiding and abetting in regards to that." Velazquez-Fontanez requested that the district court "refer them to [the] instructions as they are." The district court proposed a response that said: "Please refer to Instruction Number 44 in conjunction with Instruction Number 34, 'Aid and Abet,' in light of all the evidence presented in the case." Velazquez-Fontanez responded that he had "[n]o objection" to the district court's proposal.

Velazquez-Fontanez argues on appeal that this supplementary jury instruction was improper. But this challenge goes nowhere. Velazquez-Fontanez waived his objection when he affirmatively stated that he had "[n]o objection" to the district court's proposed response, which aligned with Velazquez-Fontanez's request that the district court refer the jury to the existing instructions. See United States v. Corbett, 870 F.3d 21, 30-31 (1st Cir. 2017) (holding that challenge to response to juror note was waived where defendant said that proposed response "restates the instruction already given, so I have no problem"); United States v. Acevedo, 882 F.3d 251, 264 (1st Cir. 2018) (holding that challenge to revised jury instruction was waived where defendant

stated he had no objection and changes were made in light of defendant's concerns).

### III. CONCLUSION

For the foregoing reasons, we <u>affirm</u> the convictions of Carlos Velazquez-Fontanez and Jose Resto-Figueroa. We <u>vacate</u> the convictions of Ruben Cotto-Andino and <u>remand</u> his case for further proceedings consistent with this opinion.