# United States Court of Appeals
## For the First Circuit

No. 19-2232

UNITED STATES OF AMERICA,

Appellee,

v.

STEPHAN KULJKO, JR.,
a/k/a Steven J. Kuljko, a/k/a Stephan Kuljko,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Howard, Chief Judge,
Selya, Circuit Judge,
and Gelpí,* District Judge.

John F. Palmer for appellant.
Donald C. Lockhart, Assistant United States Attorney, with
whom Andrew E. Lelling, United States Attorney, was on brief, for
appellee.

June 15, 2021

_____

* Of the District of Puerto Rico, sitting by designation.

**SELYA**, **Circuit Judge**.  Mounting several disparate claims of error, defendant-appellant Stephan Kuljko, Jr., a convicted fraudster who hornswoggled dozens of victims out of millions of dollars, asks us to annul the verdict returned by a jury after a lengthy trial, set aside his convictions, and vacate his 156-month incarcerative sentence.  Concluding, as we do, that the appellant's arguments are as empty as the glittering assurances that he offered to those whom he defrauded, we affirm his convictions and sentence.

## I

We briefly rehearse the travel of the case.  The government's investigation yielded copious evidence that the appellant had masterminded two serpentine schemes, both fraudulent, over a protracted period of time.  One scheme involved a bank account, supposedly frozen, which (the appellant represented) contained large sums of money.  The other scheme involved an emerald, supposedly huge and extremely valuable, which (the appellant represented) was being held in South America.  Spinning tales of riches there for the taking, the appellant hoodwinked over forty victims and bilked millions of dollars from them over a period that stretched for more than a decade.

When the facts surrounding the appellant's nefarious activities came to light, a federal grand jury sitting in the District of Massachusetts charged him with various crimes.  A superseding indictment, handed up on November 6, 2018, charged the

appellant with five counts of wire fraud, see 18 U.S.C. § 1343, and one count of obstruction of justice, see id. § 1503(a). The obstruction-of-justice count was premised on an allegation that the appellant, shortly after the original indictment was returned, took steps to conceal some twenty-three motor vehicles that were among the fruits of his fraudulent activity.

The appellant maintained his innocence and a twelve-day jury trial ensued. The jury found the appellant guilty on four of the five wire-fraud counts and on the obstruction-of-justice count. The appellant was acquitted on the remaining wire-fraud count. The district court sentenced the appellant to an upwardly variant 156-month term of immurement. This timely appeal followed.

## II

In this venue, the appellant advances two claims of trial error and a cluster of claims of sentencing error.[1] Since none possesses even a patina of plausibility, we make short shrift of them.

## A

The appellant first argues that his convictions cannot stand because the district court improperly refused to remove a

---

[1] To the extent that the appellant suggests other claims of error, such claims are either fatally underdeveloped, patently meritless, or both. We therefore reject them out of hand.

juror (whom we shall call Juror 31) for cause.  Some stage-setting is useful.

Jury empanelment took place on August 5, 2019 (the day before the trial itself started).  At the lunch break, Juror 31 — then a member of the venire — exchanged a brief salutation with an assistant United States attorney (the AUSA) in the courthouse cafeteria.[2]  The prosecutor reported this exchange to the district court, which proceeded to conduct an individualized voir dire of the juror.  In response to the court's queries, Juror 31 said, in substance, that her coworker's husband (the AUSA) worked in the building; that she thought he might be a prosecutor; that she did not know his surname; that she had met him "probably five times and never had a conversation with him"; and that "he saw me at lunch and said hi."  She assured the court that — even assuming that the AUSA toiled in the same office as the prosecutor — it would not affect her ability to serve as a juror "because I only know his wife, and we don't have conversations about him or what happens here."

After the court's interrogation of Juror 31 had concluded and the juror had left the courtroom, the district court found her credible and advised counsel that it did not "see a reason to excuse her."  The appellant's attorney asked the court

_____

    [2] In Boston, the United States Attorney's Office is housed in the same courthouse as the United States District Court.

- 4 -

to pose an additional question. The court obliged, had Juror 31 brought back to the courtroom, and inquired whether, given that the AUSA was married to her coworker and served in the same office as the prosecutor, it would "be awkward or uncomfortable if it turned out you were on a jury that found a defendant not guilty because it would be uncomfortable with your colleague at all?" The juror replied in the negative and the district court again found that she was qualified to serve on the jury. The appellant neither objected nor asked the court to remove Juror 31 for cause. And after the venire had been whittled down, the appellant's attorney did not use a peremptory strike to eliminate Juror 31. It thus came to pass that Juror 31 was seated as one of the twelve trial jurors.

Before opening statements the next day, the district court pointed out that, according to a memorandum describing witness interviews, the AUSA — although not participating in the appellant's trial — had participated in some portion of an interview of a prospective witness. The court stated that, given that the AUSA's wife worked with Juror 31, "[i]t would probably be preferable not to mention [the AUSA's] name." Neither side objected, and in line with the court's stated preference, the AUSA's name was never mentioned before the jury.

On the third day of trial, the appellant — for the first time — asked the district court to excuse Juror 31. The court

refused to do so. Two days later, the court revisited the matter and asked defense counsel if he wanted to say anything more about the possibility of excusing Juror 31. Counsel responded that, had he known that the AUSA "was actually participating" at the witness interview, he "would have exercised a peremptory [strike] to get rid of her."[3] The district court said that it would "think about it further."

The next day, defense counsel told the court that he still believed that Juror 31 should be excused for cause. The court reserved decision and, on the following day, again questioned Juror 31. She assured the court once more that her passing acquaintance with the AUSA had "no connection" to her duties as a juror. She then declared that "[m]y responsibility here is as part of this jury." When the court inquired if there was "any reason why you couldn't continue to be an open-minded, fair and impartial juror, fair to both sides," she replied, "None

---

[3] The record reflects that the memorandum describing, inter alia, the witness interview in question (which was the source of the information concerning the AUSA's participation) was delivered to defense counsel before the jury was sworn. We need not pursue this point, though, because counsel's assertion that he "would have exercised a peremptory [strike] to get rid of her" is of no consequence. After all, in the absence of a showing of bias — and none has been made here, see text infra — a party "cannot be granted a new trial if the only purpose is 'to recreate the peremptory challenge process because counsel lacked . . . information.'" Sampson v. United States, 724 F.3d 150, 164 (1st Cir. 2013) (quoting McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 555 (1984)).

whatsoever." The court, satisfied that Juror 31 would serve impartially, again refused to remove her. Juror 31 served on the jury through the end of the trial and was one of the jurors who returned the verdict.

Against this backdrop, the appellant argues that the district court should have excused Juror 31 for actual bias or, at least, for implied bias. Preserved challenges to the seating of a juror are reviewed for abuse of discretion. See United States v. Kar, 851 F.3d 59, 68 (1st Cir. 2017); United States v. Godfrey, 787 F.3d 72, 81 (1st Cir. 2015). Here, it is quite likely that the appellant's challenge (or at least some aspects of it) was either waived or forfeited. See, e.g., United States v. Soto, 799 F.3d 68, 96 (1st Cir. 2015); United States v. Chapdelaine, 989 F.2d 28, 32 (1st Cir. 1993). But even if we assume, for argument's sake, that the appellant's challenge was fully preserved, it nonetheless fails.

A district court has considerable leeway in probing concerns about juror impartiality and in determining what remedial measures, if any, may be appropriate. See United States v. Tejeda, 481 F.3d 44, 52 (1st Cir. 2007); United States v. Rodríguez-Ortiz, 455 F.3d 18, 23 (1st Cir. 2006). Where, as here, the district court has had the opportunity to question the challenged juror and to see and hear her responses in real time, the party who challenges the court's decision to allow the juror to sit

ordinarily faces an uphill climb.  See Amirault v. Fair, 968 F.2d 1404, 1405 (1st Cir. 1992) (noting that "issues of juror credibility and honesty are determinations 'peculiarly within a trial judge's province' and are accorded great deference" (quoting Wainwright v. Witt, 469 U.S. 412, 428 (1985))).

In the case at hand, there is no hint of an abuse of discretion.  Notably, the appellant finds no fault with the scope of the district court's interrogation of Juror 31.  He argues instead that Juror 31's answers to the court's questions somehow require a finding that Juror 31 was either actually or impliedly biased.

The claim of actual bias is fanciful.  The district court, after careful questioning, explicitly found that Juror 31 was credible in declaring her impartiality.  That finding was premised not only on the juror's avowals but also on the court's assessment of her demeanor.  Moreover, the finding was consistent with the uncontradicted facts concerning the tenuousness of Juror 31's derivative relationship with the AUSA.  The appellant has identified no principled way in which we could second-guess it.

The claim of implied bias is also without merit.  Such a claim requires "'exceptional' or 'extreme' circumstances" giving rise to an implication of bias.  Id. at 1406 (quoting Smith v. Phillips, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring)).  As we explain below, no such circumstances existed here.

The appellant says, in effect, that bias should be implied because the juror had a coworker whose husband (the AUSA) labored in the same office as the prosecutor and participated in the pretrial interview of a witness. While we do not gainsay that even such an attenuated relationship was enough to spur a vigilant trial court to consider whether bias could be implied, the underlying hypothesis is sufficiently conjectural that bias could not be implied as a matter of law. See United States v. Wood, 299 U.S. 123, 149 (1936) (warning against an imputation of bias that "rests on an assumption without any rational foundation"). And here, the court's rejection of such an implication, after a painstaking inquiry, was well within the wide margins of its discretion. Its search into the possibility of bias was both cautious and thorough: it questioned Juror 31 at some length, found her credible, and concluded — supportably, we think — that an implication of bias was unwarranted. On this record, that conclusion demands our deference.

To cinch the matter, we have rejected claims of implied bias based on scenarios more conducive to juror removal than that presented here. See, e.g., Kar, 851 F.3d at 64, 68 (finding no implied bias when juror was "[f]amily friend" and "maybe once or twice" babysat for prosecution team's paralegal); United States v. Burgos-Montes, 786 F.3d 92, 111 (1st Cir. 2015) (finding no implied bias when juror and defense witness were distant cousins); cf.

United States v. Torres, 960 F.2d 226, 228 (1st Cir. 1992) (finding no plain error when juror who knew prosecutor's brother was not excused for implied bias).  The appellant's claim of error is, therefore, unavailing.

**B**

The appellant's second claim of error targets a comment made by the prosecutor during his rebuttal argument.  In his closing, defense counsel had suggested that two of the government's witnesses may have fabricated their account of a three-way telephone conversation in which they claimed to have participated.  Counsel pointed out that there was "no documentary evidence of this call" and added that the jurors would not "find a single mention of a three-way call" involving the two government witnesses and the appellant in the compendious telephone records (spanning a ten-to-twelve year period) that the government had introduced into evidence.

Responding in rebuttal, the prosecutor noted that defense counsel had not asked the custodian of the telephone records:

> [W]hen she was on the stand with all of those phone records whether there is any verification in the records, she could have answered him, because you can do it yourself if you want to wade through 5,000 pages of phone records.  . . .  What you won't find is anything indicating that that's a three-way phone call because phone records don't identify three-way phone calls.

Immediately after this comment, defense counsel objected. The district court noted the objection and reminded the jury that "as I've instructed [you] and will reiterate, anything the lawyers say is not evidence, and if your memory of the evidence individually and collectively differs from what any lawyer says, it's your memory that controls." At that point, the prosecutor resumed his rebuttal argument, telling the jury (without any further objection) that he was only suggesting that "the records don't indicate . . . a third party involved. It doesn't mean it didn't happen . . . ."

Given the appellant's contemporaneous objection, his claim of error — insofar as it relates to the quoted statement — is preserved. Review is, therefore, de novo. See United States v. Berroa, 856 F.3d 141, 161 (1st Cir. 2017); United States v. Sepúlveda-Hernández, 752 F.3d 22, 31 (1st Cir. 2014).

An attorney's summation is not meant to be used as a device for the introduction of new facts into evidence. In this instance, the appellant complains that a portion of the prosecutor's comment — "phone records don't identify three-way phone calls" — states a fact not in evidence. The appellant's complaint is literally true: the government does not point to any competent evidence in the record verifying the asserted fact that "phone records don't identify three-way phone calls." The ultimate test, though, is whether the error caused harm. See Berroa, 856

F.3d at 162. Here, the error was manifestly harmless. We explain briefly.

In this context, harmless error review takes into account a multiplicity of factors, including the severity of the impropriety, the nature of the impropriety (that is, whether or not it was deliberate, whether or not it was isolated, and the like), the strength of the government's case against the defendant, and how the district court responded to the impropriety (especially the timing, nature, and force of any curative instructions). See id. The bottom-line question is whether the impropriety "so poisoned the well that the trial's outcome was likely affected." United States v. Mejia-Lozano, 829 F.2d 268, 274 (1st Cir. 1987); see United States v. Morales-Cartagena, 987 F.2d 849, 854 (1st Cir. 1993).

Here, the impropriety was not severe. Although the prosecutor should not have made the statement, he went on to explain what he meant in a way that both mitigated the force of the comment and indicated that any misconduct was not deliberate. Moreover, the reference was fleeting; it was an isolated comment in the course of a twelve-day trial. Cf. United States v. Peña-Santo, 809 F.3d 686, 700 (1st Cir. 2015) (finding no error where "prosecutor's improper statement was isolated and not deliberate").

Importantly, the court gave a swift and strong curative instruction — an instruction that apparently met with the appellant's satisfaction (he neither objected to its phrasing nor asked for some further admonition). By the same token, the appellant does not fault the instruction in his appellate briefing. What is more, the jury hardly could have overlooked the court's prophylactic language: the court made the same point in its preliminary jury instructions at the start of trial and reiterated the caution in the jury charge. The presence, content, and timing of curative instructions are salient factors in assessing the harmfulness vel non of an improper comment by a prosecutor during closing argument. See, e.g., United States v. Soto-Beníquez, 356 F.3d 1, 43 (1st Cir. 2003). In this case, those factors favor a finding of harmlessness.

Last — but surely not least — the evidence of the appellant's guilt was overwhelming. The government presented twenty-five witnesses and complemented their testimony with an avalanche of documentary proof. The strength of the evidence is always an "important integer" in the harmless error calculus. United States v. Kilmartin, 944 F.3d 315, 338 (1st Cir. 2019). And although the phone records themselves are silent as to whether the appellant had placed three-way calls, the evidence tilts heavily toward a conclusion that the call to which the prosecutor alluded had actually occurred. This evidence included testimony

from the other two participants in the three-way call, as well as an email — sent a few hours after the call's completion — that confirmed its existence. And, finally, there was evidence of a pattern: no fewer than four other victims testified about similar three-way calls. Indeed, the jury heard a recording of one of these three-way calls.

The short of it is that the claim of error fails: the prosecutor's comment did not poison the well. On this record, it would strain credulity to think that the untoward comment affected or influenced the jury verdict in any way. The impropriety was, therefore, harmless.

We add a coda. Although the appellant points to other comments by the prosecutor that he now says were questionable, none of those comments drew a contemporaneous objection. Thus, review would be only for plain error, see Sepúlveda-Hernández, 752 F.3d at 31; United States v. Sánchez-Berríos, 424 F.3d 65, 73 (1st Cir. 2005), and plain error is plainly absent.

## C

We next address the appellant's multiple claims of sentencing error. After exploring the relevant procedural history, we explain why those claims are impuissant.

Following the jury verdict, the district court ordered the preparation of a presentence investigation report (the PSI Report). The PSI Report identified forty-six victims of the

- 14 -

appellant's fraudulent schemes and established an amount of loss in excess of $2,700,000. The probation office recommended a total offense level of 31[4] and a criminal history category (CHC) of II (based on the appellant's prior convictions for theft and domestic violence). These recommendations yielded a tentative guideline sentencing range (GSR) of 121-151 months in prison. The PSI Report further advised that either an upward departure or an upward variance might be appropriate because the appellant's CHC substantially underrepresented the seriousness of his criminal record and the likelihood of recidivism.

At the disposition hearing, the district court — ruling favorably on two defense objections — rejected the proposed role-in-the-offense adjustment and deleted the criminal history point that had been assigned for the appellant's domestic violence conviction. Taking those changes into account, the court set the appellant's total offense level at 29 and placed him in CHC I.[5]

---

[4] The probation office started with a base offense level of 7, see USSG §2B1.1(a)(1); applied a 16-level enhancement due to the amount of loss, see id. §2B1.1(b)(1)(I); added 4 levels because the offense resulted in substantial financial hardship to five or more victims, see id. §2B1.1(b)(2)(B); assayed a 2-level upward role-in-the-offense adjustment, see id. §3B1.1(c); and topped its calculations with a 2-level enhancement for obstruction of justice, see id. §3C1.1.

[5] The appellant had at least five prior convictions that — because they were remote in time — were not factored into the assessment of his CHC. See USSG §4A1.2(e).

It proceeded to recast the GSR at 87-108 months. Neither side objected to this recasted GSR.

Early on, the court indicated that it was disposed either to depart or vary upward based on factors such as the inadequacy of the appellant's CHC and the likelihood of recidivism. The court reiterated its inclination to depart or vary upward once it formulated the reduced GSR.

After making its preliminary thinking known, the court solicited the attorneys' views. The question, it said, was "considering all the Section 3553[a] factors, what's the most appropriate sentence, what's the sentence that's sufficient and no more than necessary[?]" The government asked for a 121-month sentence, and the appellant (through counsel) sought a 70-month sentence. The appellant himself declined to allocute. Following a short recess, the court imposed a 156-month term of immurement.

**1**

Our approach to claims of sentencing error is familiar:

Appellate review of a criminal defendant's claims of sentencing error involves a two-step pavane. See United States v. Matos-de-Jesús, 856 F.3d 174, 177 (1st Cir. 2017). Under this bifurcated framework, we first examine the validity vel non of any claims of procedural error. See id. If the sentence passes procedural muster, we then examine any challenge to its substantive reasonableness. See id.

United States v. Miranda-Díaz, 942 F.3d 33, 39 (1st Cir. 2019).

- 16 -

Preserved claims — whether procedural or substantive — are reviewed for abuse of discretion. See Gall v. United States, 552 U.S. 38, 51 (2007); United States v. Martin, 520 F.3d 87, 92 (1st Cir. 2008). We have made it clear, though, that "[t]he abuse-of-discretion standard is not monolithic." United States v. Rivera-Morales, 961 F.3d 1, 15 (1st Cir. 2020). "[W]ithin it, we review the sentencing court's findings of fact for clear error and questions of law . . . de novo." Id.; see United States v. Flores-Machicote, 706 F.3d 16, 20 (1st Cir. 2013).

Unpreserved claims of error — if reviewable at all — are scrutinized under less appellant-friendly standards. Pertinently, forfeited claims are reviewed only for plain error. See United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001). "The plain error hurdle is high." United States v. Hunnewell, 891 F.2d 955, 956 (1st Cir. 1989). "Review for plain error entails four showings: (1) that an error occurred (2) which was clear or obvious and which not only (3) affected the [appell]ant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Duarte, 246 F.3d at 60. Under plain error review, the appellant "must carry the devoir of persuasion as to all four of these elements." United States v. Pinkham, 896 F.3d 133, 136-37 (1st Cir. 2018).

In this case, the appellant advances three claims of procedural sentencing error and a claim that his sentence is

substantively unreasonable. We begin our analysis with his trio of procedural claims, none of which was raised in the court below. Our review, therefore, is only for plain error. See Duarte, 246 F.3d at 60.

**2**

The appellant suggests that, under Federal Rule of Criminal Procedure 32(h), he was entitled to receive (yet did not receive) advance notice of the district court's intention to vary upward. He is wrong both as to what Rule 32(h) requires and as to what notice he received.

It is clear beyond hope of contradiction that Rule 32(h) requires advance notice of departures, not variances. See Irizarry v. United States, 553 U.S. 708, 714 (2008); United States v. Daoust, 888 F.3d 571, 575 (1st Cir. 2018); United States v. Santini-Santiago, 846 F.3d 487, 490 (1st Cir. 2017). And at any rate, the court below gave the appellant ample advance notice that it was mulling an upward variance. Indeed, at the disposition hearing, the appellant's counsel — in response to a direct question — assured the court that he was neither surprised by, nor unprepared for, the court's consideration of a substantial upward variance. There was no error in this regard, plain or otherwise.

**3**

Next, the appellant argues that the sentence was not adequately explained. This argument, too, is hopeless. The

sentencing court described the factors material to its upward variance in great detail and tied those factors expertly to the considerations limned in 18 U.S.C. § 3553(a). No more was exigible. See United States v. Rodríguez-Cruz, 997 F.3d 362, 367 (1st Cir. 2021) ("Although a sentencing court is duty-bound to consider the section 3553(a) factors, it need not descant upon each and every such factor."); United States v. Clogston, 662 F.3d 588, 592 (1st Cir. 2011) (similar); United States v. Vargas-Dávila, 649 F.3d 129, 131 (1st Cir. 2011) (similar). Nothing resembling plain error occurred.

**4**

The appellant's last claim of procedural error posits that the sentencing court erred by relying on factors "already accounted for in the Guideline[s]." Specifically, he submits that the court below — once it had settled upon the proper GSR — should not have considered "amount of loss," "substantial financial hardship," "obstruction of justice, and the ten-year duration of the fraudulent conduct." These factors, he says, already were considered by the court in formulating enhancements that merged into the ultimate GSR calculation and should not have been considered again in fashioning an upward variance. Although the appellant does not use the term, this argument is nothing more than a jeremiad against what the appellant perceives as double-

counting (that is, the use of a particular fact in more than one way in the sentencing calculus).

The claim that the sentencing court double-counted certain sentencing factors rests on a kernel of truth — but that kernel of truth does not take the appellant very far. "In the sentencing context, double counting is a phenomenon that is less sinister than the name implies." United States v. Zapata, 1 F.3d 46, 47 (1st Cir. 1993). "When formulating its overall sentencing rationale, a sentencing court is not normally foreclosed from considering the same nucleus of operative facts that grounded an enhancement." United States v. Sepúlveda-Hernández, 817 F.3d 30, 35 (1st Cir. 2016). "It follows that a sentencing court may rely on a factor that is already included in the calculation of the GSR to impose an upward or downward variance as long as the court 'articulate[s] specifically the reasons that this particular defendant's situation is different from the ordinary situation covered by the guidelines calculation.'" United States v. Bruno-Campos, 978 F.3d 801, 806 (1st Cir. 2020) (quoting United States v. Zapete-Garcia, 447 F.3d 57, 60 (1st Cir. 2006)).

So it is here. The redundancy of which the appellant complains is nothing more than a reflection that certain facts relevant to his sentencing were present in extraordinary or exaggerated degrees. Some examples will suffice to illustrate the point.

- 20 -

To begin, the appellant defrauded forty-six individuals — far above the "five or more" victims needed to justify the imposition of a sentencing enhancement under USSG §2B1.1(b)(2)(B). See, e.g., Bruno-Campos, 978 F.3d at 806; United States v. Díaz-Lugo, 963 F.3d 145, 155 (1st Cir. 2020). So, too, the amount of loss was more than just a monetary estimate: it was composed of funds swindled from individuals who (in many instances) could ill afford the losses. Similarly, the imposition of an obstruction-of-justice enhancement (for concealing the twenty-three vehicles) did not render that fact irrelevant for purposes of the upward variance where, as here, the appellant used the identity of an innocent third party (his daughter) to facilitate the cover-up. Distinctions of this sort also can be drawn with respect to the other factors that the appellant says were double-counted. On this record, the appellant has failed to show any clear or obvious error in the district court's use of double-counting.

**5**

Finally, the appellant challenges the substantive reasonableness of his 156-month prison sentence. This challenge must be treated as preserved and, thus, our review is for abuse of discretion. See Holguin-Hernandez v. United States, 140 S. Ct. 762, 766 (2020); Bruno-Campos, 978 F.3d at 808.

"Our case law makes pellucid that the hallmarks of a substantively reasonable sentence are a plausible sentencing

rationale and a defensible result." Rodríguez-Cruz, 997 F.3d at 366; see Clogston, 662 F.3d at 593. When — as in this case — the sentencing court pronounces an upwardly variant sentence, it "must provide an adequate explanation for the variance." Rodríguez-Cruz, 997 F.3d at 366. Notwithstanding this obligation, the sentencing court need not "be precise to the point of pedantry." Id. (quoting United States v. Del Valle-Rodríguez, 761 F.3d 171, 177 (1st Cir. 2014)).

Here, the district court found the GSR "greatly insufficient" to capture the gravity of the offenses of conviction. What is more, it found the GSR inadequate "to protect the public from" the appellant. The court proceeded to quote from victim-impact statements and noted that — with respect to one victim in particular — the appellant had continued to squeeze the victim for funds even after he knew that the victim needed money to care for his brother (who was suffering from multiple sclerosis). The court observed that it could not "remember anybody who committed more despicable, more fraudulent crimes than [the appellant], knowing that these people were sacrificing the well-being of their famil[ies]."

Nor did the court's sentencing rationale stop there. It went on to find that the appellant's CHC "grossly underrepresent[ed]" the risk of his recidivism; that the frauds had lasted over a decade; that the appellant had bilked his victims

out of millions of dollars but had never helped to pay for the education of his own children; that he had used his daughter's name to help facilitate his obstruction of justice; and that the court wished to send a strong message not only to the appellant but also to those who might be tempted to perpetrate similar frauds.

In sum, the district court articulated its sentencing rationale in clear and unmistakable terms. That rationale was plausible (indeed, compelling). The court reasonably concluded that the facts of the case made manifest the appellant's venality, his utter disregard for the plight of others, and the danger that he presented to the community. In view of this plausible rationale, we have no quarrel with the court's determination that an upwardly variant sentence was in order.

This leaves only the question of whether the 156-month prison sentence represents a defensible result. The mere fact that the length of the sentence reflects a substantial increase over the top of the GSR does not render it substantively unreasonable. See Flores-Machicote, 706 F.3d at 25. Instead, "the inquiry is fact-sensitive and case-specific." Rodríguez-Cruz, 997 F.3d at 367; see Martin, 520 F.3d at 91. Here, moreover, the egregious nature of the appellant's frauds and the callous manner in which they were committed provide a solid foundation for the upward variance.

- 23 -

On occasion, extravagant criminality may call for an extravagant sentence. This is such a case: although the extent of the upward variance is substantial, so, too, is the scope of the appellant's frauds and the extent of his esurient greed. When all is said and done, the record leaves no doubt that even the top of the GSR was incommensurate with the appellant's wrongdoing. Evaluating the record as a whole, we are confident that the appellant's upwardly variant sentence falls within the "broad universe" of reasonable sentencing outcomes. Rivera-Morales, 961 F.3d at 21. Accordingly, we reject the appellant's challenge to the substantive reasonableness of his sentence.

## III

We need go no further. For aught that appears, the appellant was fairly tried before an able and thoughtful judge and an impartial jury, justly convicted, and lawfully sentenced. For the reasons elucidated above, the judgment of the district court is

**Affirmed**.