**Not for Publication in West's Federal Reporter**

# United States Court of Appeals
## For the First Circuit

No. 24-1311

UNITED STATES OF AMERICA,

Appellee,

v.

MARK ANTHONY FIGUEROA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Montecalvo, Thompson, and Aframe,
Circuit Judges.

David J. Nathanson, with whom Danya F. Fullerton and Jellison & Nathanson, LLP, were on brief, for appellant.

Donald C. Lockhart, Assistant United States Attorney, with whom Leah B. Foley, United States Attorney, was on brief, for appellee.

March 17, 2026

**MONTECALVO, <u>Circuit Judge</u>.** After a jury trial, Mark Anthony Figueroa was convicted of one count of money laundering conspiracy. Figueroa's conviction stemmed from his involvement in six cash transfers of roughly $100,000 each, which government witnesses testified involved drug proceeds. Figueroa now argues that, at trial, the district court improperly admitted (1) a cooperating witness's testimony about that witness's kidnapping and beating by drug cartel members and (2) certain testimony from three law enforcement witnesses, which alone or cumulatively constituted prejudicial overview testimony and testimony on ultimate issues. For the reasons below, we affirm Figueroa's conviction.

## I. Background & Procedural History

The government alleges that Figueroa participated in six different cash transactions between February 2019 and May 2020. Figueroa was arrested on December 11, 2020, and charged with one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h).

### A. Pre-Trial Conference

At a pre-trial conference held on March 23, 2023, the government informed the court that it planned to elicit testimony from Pedro Antonio Magana-Aladro ("Magana"), a cooperating witness, about a kidnapping Magana suffered at the hands of a drug cartel.

The court remarked that "a witness can tell his or her own story as long as it's relevant to what we are doing. It sounds like it might be a kind of Breaking Bad interest in the testimony as it unfolds." Figueroa's counsel offered the following: "I think there will be an objection, though, Judge, to being kidnapped and things like that. I think that type of testimony has no relevance to this case." The court replied: "Well, what I would do is give a curative instruction at that point to the jury saying there is no allegation that the defendant was involved in any plot to kidnap this witness or anybody else." The parties and the court did not discuss the issue further.

**B. Trial**

The jury trial commenced in March 2023. The court instructed the jury on the first day of trial. Among other instructions, the court described the jurors' duty not to prematurely discuss the case:

> The first [instruction] sounds harder than it is, but actually I'm required to tell you not to discuss the case or anything about it with each other or anyone else before you begin your deliberations. That's the way the Court of Appeals -- words that [sic] I think would be absolutely impossible, given human nature, to swear you to an oath of silence. So I think what the Court of Appeals means, and what I mean by it, is that don't offer any opinion about any ultimate issue in the case until you've heard all of the evidence and then begin deliberations and have the chance to hear what your fellow jurors think. Until then, keep an open mind.

No party objected to this instruction.

## 1. Factual Overview

At trial, government agents and cooperators testified about the six alleged money laundering transactions that form the basis of Figueroa's conviction. We briefly recount the general scheme, then describe the facts the witnesses testified to about the money transfers for which Figueroa was convicted, before detailing the testimony to which Figueroa now objects.

According to the government's witnesses, Magana operated a money laundering operation at least in part on behalf of Frank Cruz and a man called "Rojo," both of whom were drug dealers based in Mexico. Dealers would purchase drugs from the pair on credit, then repay them by using Magana's operation to move money from the United States to Rojo's accounts in Mexico.[1] In brief, Cruz would contact Magana and let him know when a dealer was ready to make a "money drop[]." Magana would then arrange for the dealer to meet one of Magana's couriers and give the courier the cash. To allow the dealer and courier to verify one another's identities, Magana would give the dealer information about how the courier would be dressed, and would provide the dealer with certain information -- such as the unique serial number of a dollar bill

---

[1] Magana's testimony as a cooperating witness about his operation is discussed in more detail in Part 2.b., infra.

that the courier would be carrying -- which would allow the dealer to verify that the courier was who they said they were. Once the cash was in Magana's hands, he employed various bank transfers to move the money into Mexican accounts controlled by Cruz.

According to government witnesses, Figueroa was one such trafficker who purchased drugs from Cruz and/or Rojo and used Magana's network to pay them back.

We now outline the cash transactions that were described at trial. First, on February 27, 2019, federal agents surveilling Figueroa's home saw him leave his home with a duffel bag; they then followed him to Yotel Boston Hotel. At the hotel, Figueroa carried the duffle bag inside, met another person in the lobby, and entered the elevator with them. Soon after, the person Figueroa had met left the hotel, went to a Bank of America branch, and deposited $80,010 in cash.

Second, on March 15, 2019, Figueroa flew to Orlando, Florida. The next day, Homeland Security Investigations ("HSI") agents in Florida saw Figueroa in a Kohl's parking lot, where he met with a man who matched the description of someone who, investigators working on a separate investigation had learned, would be participating in a "money drop," that is, a large in-person transfer of cash that investigators suspected were drug proceeds. Figueroa and the man left the parking lot together and

the other man later deposited $85,000 in cash at a Bank of America branch.

Third, on April 18, 2019, the Massachusetts State Police stopped and searched Figueroa's car and seized a box with $100,050 in cash inside. Figueroa claimed that the money came from a restaurant he owned named "JPizle."

Fourth, agents testified that on October 1, 2019, a courier approached Figueroa outside JPizle and showed him a dollar bill which Figueroa then examined and checked against his phone. The pair entered JPizle together, each wearing a backpack, and later emerged having swapped backpacks. The courier then went to two nearby Bank of America branches, depositing $75,000 at one and $33,700 at the other. The next day, $74,200 and $33,665 were wired from these accounts to an account in Mexico.

Fifth, on April 16, 2020, undercover agents conducted a controlled transaction at JPizle in which they posed as Magana's couriers and purported to be receiving cash on Magana's behalf. Figueroa counted out $101,000 for the agents. When the agents asked if he worked with "perico," which government witnesses testified was slang for cocaine, Figueroa responded that he worked "con todo, with everything" and referred to himself as "the factory."

Sixth, on May 1, 2020, a woman entered JPizle with Figueroa, left carrying a white bag, and drove away. An HSI agent

stopped her car and, during the ensuing search, seized a white bag containing $109,100. The woman denied that the bag was hers.

Aside from witness testimony about the six transactions, the government introduced other evidence at trial, including videotapes from the alleged money drops and recorded phone calls.

During one such call from July 2019, Figueroa identified himself as "Mikey" before speaking with the informant on the phone about the cost of "little cheeses," "equipment," and "white things," which agents testified were all slang terms for narcotics. Figueroa also stated, "I have the whole line," after describing a supply chain that ran from Mexico to the United States. The government also introduced WhatsApp messages between Figueroa and Joaquin Coboj-Acosta, another alleged participant in the scheme, in which the pair discussed the profit they expected to make from selling a bag of pills.

In addition, agents testified that searches of Figueroa's phone revealed FedEx tracking information for a box of cocaine addressed to Harvard University and communications with two FedEx drivers who, agents testified, were diverting packages of drugs from the nominal recipient on the label to the true intended recipients.

## 2. Challenged Testimony

We now recount the testimony that Figueroa challenges.

### a. Challenged Testimony of DEA Special Agent O'Shaughnessy

Drug Enforcement Administration ("DEA") special agent Michael O'Shaughnessy was the government's first witness. He testified about the investigation and his participation in it. Figueroa now challenges the admission of thirteen pieces of O'Shaughnessy's testimony, some of which he contemporaneously objected to.

As to the roles of Coboj-Acosta, Carlos Estrella, and Jesus Emilio Campoy-Acuna, O'Shaughnessy testified as follows:

(1) "We identified [Coboj-Acosta] as a supplier or [drug trafficking organization ("DTO")] cell head working in conjunction with Mr. Figueroa." Figueroa's objection to this statement was overruled.

(2) The government asked questions about who Estrella was "associated with" and who his "supplier" was. Figueroa objected, and the court instructed the jury that "there is no guilt by association. You will have to wait for evidence before you draw this conclusion that the agent is suggesting you make."

(3) Campoy-Acuna was a target of the investigation, and he was "a Mexican national living in Hermosillo Sonora, Mexico, and we identified him as another DTO cell head." Figueroa did not object.

O'Shaughnessy also testified about the two traffic stops -- one involving Figueroa and one involving a woman who had just left Figueroa's restaurant:

(4) The government asked O'Shaughnessy why he "believe[d] that [Figueroa] would have money on his person traveling in his car" on April 18, 2019. Figueroa objected, to which the judge replied that "asking [O'Shaughnessy's] belief" was "fair enough." O'Shaughnessy then answered, "we received information from Mr. Magana that there was going to be a money drop to another courier later that day."

(5) During the same April 2019 stop, "at one point a bag or a box containing a large quantity of U.S. currency was discovered and subsequently seized." Officers seized "[a]pproximately $100,000." Figueroa objected to this testimony, which the court overruled.

(6) Investigators "coordinated a vehicle stop with the Massachusetts State Police" on May 1, 2020. O'Shaughnessy explained that the woman in the stopped car was "the same woman that left JPizle earlier that day," to which Figueroa objected. The court overruled this objection.

O'Shaughnessy also testified about searches of Figueroa's phone and other aspects of the investigation, none of which Figueroa objected to:

(7) O'Shaughnessy obtained the contacts of Figueroa's phone when "Figueroa traveled internationally on at least two occasions," and, in connection with that travel, O'Shaughnessy's "counterparts with [Homeland Security Investigations] contacted [Customs and Border Patrol]," detained Figueroa, and searched his phone.

(8) O'Shaughnessy explained that he was "able to confirm that Mr. Magana had contact with Mr. Figueroa" through "[p]hone and text conversations."

(9) "Maiky" was an alias for Figueroa and that O'Shaughnessy obtained this information from a man named Francisco Torres after Torres's arrest.

(10) O'Shaughnessy was "familiar with" a phone number for Figueroa that "Magana provided agents in San Diego, who then relayed it to us."

(11) "Agent Rob Vega, with the DEA" provided information that Figueroa and a courier were meeting at JPizle on October 1, 2019.

(12) Investigators "received information from" the DEA's Financial Investigations Team that "there would be a money pickup at [JPizle] around midday" on April 16, 2020.

(13) In April 2020, a phone number "was run by our [Financial Investigations Team], the same phone number, for a money pickup that they were coordinating in the Boston area."

Finally, during cross-examination, Figueroa's counsel asked O'Shaughnessy "what the government's theory of the case is," to which the government objected. The judge allowed the question because it occurred during cross-examination.

### b. Challenged Testimony of Magana

Magana testified as a cooperating witness. He described the currency exchange house he operated in Mexico as part of the drug trafficking organization affiliated with Cruz and Rojo. Magana testified that Cruz used Magana's services to move and exchange money that Magana believed was connected to drugs. Magana explained that he employed multiple couriers who would pick up drug money in the United States, deposit the money at Bank of America branches, and wire it to accounts in Mexico.

He told the jury that, in 2018, more than $300,000 that belonged to Rojo -- an alleged drug dealer who was either Cruz's "boss or customer" -- was seized from one of Magana's couriers. On Rojo or Cruz's orders, cartel members kidnapped and beat Magana before ordering him to work off his debt to Rojo. Magana testified that he later turned himself in to agents at the Mexico-United States border and became an informant in exchange for relocation to the United States.

Magana testified as follows about his kidnapping: "[t]hey put [on] a . . . little thing so I couldn't see where I was going, and they took me to like a rural sort of ranch-like

- 11 -

area to meet a guy named Rojo"; "[t]hey just wanted their money back, so they started beating me up"; "they beat me up with this paddleboard thing. They broke one." At one point in his testimony, Magana took a moment to collect himself. During this testimony, Figueroa's counsel made no objections, and no jury instructions related to the testimony were requested or given.

On cross-examination, Figueroa's counsel asked Magana if it was "fair to say" Magana was "the boss of" his money-exchange business, to which Magana responded in the affirmative. Figueroa's counsel later asked Magana if he was "the victim" of Cruz and the cartel. When Magana answered in the negative, Figueroa's counsel elicited testimony about the kidnapping: "you were taken somewhere, right?"; "you were beaten, right?"; and "they allowed you to go back to your business to continue running the business, right?" Magana responded in the affirmative to all the above questions.

### c. Challenged Testimony of Officer Hernandez

Alex Hernandez is an officer with the Bedford Police Department and an undercover agent for the DEA Financial Investigations Team. He testified about the undercover investigation of Figueroa at JPizle on April 16, 2020. On direct examination, Hernandez referred to the money at issue as "drug proceeds" at least four times. The second time, Figueroa's counsel

objected after Hernandez testified that a courier would have a dollar bill "as a confirmation that [he was] the one authorized [by] the drug[-]trafficking organization to pick up the drug proceeds." This objection was overruled. Figueroa's counsel did not object the other three times Hernandez used the phrase on direct examination. During cross-examination, Hernandez referred to the money as "drug proceeds" four more times, all without objection. Figueroa's counsel also used the phrase at least twice during questioning.

### d. Challenged Testimony of George

Lauren George was the government's last witness. George, an auditor for the U.S. Attorney's Office in Boston, Massachusetts, testified about her investigation of the bank records and transactions. When the government asked if George "create[d] a summary chart that shows the flow of money for the money laundering transactions at issue in this case," she responded in the affirmative. She later testified that she knew who the phone contact "Indio" in Figueroa's phone referred to. When the government asked who Indio was, Figueroa's counsel objected. The court overruled the objection, and George answered that Indio was Coboj-Acosta, who she described as "[a]n individual who's part of the organization." Figueroa's counsel objected again but was overruled.

At the end of the trial, Figueroa was convicted of the single count charged.

## II.  Standard of Review

We review preserved claims of evidentiary error for abuse of discretion.  United States v. García-Sierra, 994 F.3d 17, 26 (1st Cir. 2021).  If we find an abuse of discretion, we vacate the conviction unless the error was harmless.  Id.  An error is harmless if "the judgment was not substantially swayed by the error."  United States v. Villa-Guillen, 102 F.4th 508, 515 (1st Cir. 2024) (quoting United States v. Burgos-Montes, 786 F.3d 92, 114 (1st Cir. 2015)).

Unpreserved claims, on the other hand, receive only plain error review.  García-Sierra, 994 F.3d at 26.  To prevail under this standard, an appellant must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the [appellant's] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  United States v. Feliciano-Candelario, 128 F.4th 5, 11 (1st Cir. 2025) (quoting United States v. Cruz-Agosto, 102 F.4th 20, 24 (1st Cir. 2024)).

## III. Discussion

Figueroa argues the district court erred in admitting certain testimony from (1) Magana regarding his kidnapping and assault by a drug cartel and (2) three law enforcement

witnesses -- which Figueroa portrays as improper overview testimony. We take each challenge in turn.

## A. Magana's Testimony

Figueroa argues that Magana's testimony about "his experience being kidnapped by the drug cartel" was irrelevant and unduly prejudicial because it tied Figueroa to the kidnapping (with which he was indisputably not involved) and because it improperly lent sympathy, and thus credibility, to Magana's testimony. He contends that this error's prejudicial effect was amplified when the district court failed to appropriately instruct the jury not to discuss the case before all evidence was presented. For reasons we now explain, however, we see no basis here for vacating Figueroa's conviction.

Before reaching the admission itself, the parties first disagree about what standard of review applies. Figueroa argues that abuse of discretion applies because he objected to the testimony at the pretrial conference and the district court definitively responded that it would give a curative instruction. The government contends that both Figueroa's counsel and the district court discussed Magana's potential testimony only in "tentative and qualified" terms, without any definitive objection or ruling, so we should review for plain error.

We need not linger on this dispute, however, because Figueroa's argument fails even under the more favorable abuse of

discretion standard. Under that standard, "[a] harmless evidentiary error does not require reversal." United States v. Velazquez-Fontanez, 6 F.4th 205, 219 (1st Cir. 2021). And we conclude that the asserted error here was, if indeed error, ultimately harmless.

At trial, the government sought specifically to introduce testimony from Magana "about his experience being kidnapped by the drug cartel," even notifying the district court of the potentially "cinematic nature of that testimony." The government explained that Magana's testimony "regarding his experience working with Mexican drug cartels," including being kidnapped by affiliates of one, was relevant because evidence that Magana was working with a drug cartel was "relevant to establishing that the money that was laundered was, in fact, proceeds of drug traffickings." And, as the government argues now, the kidnapping testimony constituted a relatively small portion of Magana's overall testimony about his involvement in the laundering of drug proceeds.[2]

_____

[2] Beyond testimony about his kidnapping, Magana provided ample evidence that the money at issue was drug proceeds, testifying that he operated a currency exchange house exchanging U.S. dollars for Mexican pesos and vice versa; that he believed some of his customers were exchanging the proceeds of drug sales; that he took on Frank Cruz as a client, who needed laundering services for "[d]rug money"; that he, at Cruz's request, set up a system of couriers in the United States who would pick up money from customers and deposit the money into American bank accounts, which he would then wire to Mexican accounts; that this system "use[d]

- 16 -

Even if we assume that Magana's discussion of his kidnapping was irrelevant, as Figueroa contends, and served to improperly lend sympathy to Magana and thus some degree of unwarranted credibility to his testimony unrelated to the kidnapping, we cannot agree that this was anything beyond harmless error because the evidence against him -- beyond Magana's testimony -- was so strong. See, e.g., United States v. Rivera-Carrasquillo, 933 F.3d 33, 46-47 (1st Cir. 2019) (allegedly erroneous admission under Rule 403 of "gruesome" crime scene, firearm, and autopsy photographs was harmless because, given weight of other evidence, the admission did not influence the outcome of the trial).

Indeed, much of Magana's most inculpatory testimony about Figueroa was corroborated with unambiguous direct evidence of inculpatory communications between the pair -- evidence that spoke for itself. Magana testified that, after he began working as a government informant, he and Figueroa exchanged calls and text messages and coordinated a money pick-up at Figueroa's restaurant -- testimony backed up by the actual texts and recordings of the phone calls.

---

a lot of secrecy, like serial number, code names, the way you handle the money" because "[y]ou wouldn't need this type of secrecy if it was legit money"; and that sometimes his couriers "when they went to drops, . . . sometimes they saw like maybe a gun, drugs."

Moreover, Magana was hardly the "linchpin of the government's case," as Figueroa now argues. We describe below a sampling of other inculpatory evidence unrelated to Magana, and thus that does not depend on his credibility, that also strongly tends to show that the cash was linked to drug proceeds.

At trial, the government introduced into evidence translated excerpts of a recorded phone call between Figueroa and an informant. There, Figueroa and the informant discussed supplies of "little cheeses" and "white things" -- slang for narcotics, according to the government -- and prices for "white material" per kilogram. Figueroa described how he bought the "white materials" in Michoacan, Mexico, and sold them in the United States, with prices increasing the farther north that he went. On the call, Figueroa also said, "I have the whole line[,] do you understand?" which the government's witness explained meant that "[Figueroa] has the whole source all the way up to the distribution in America."

The government also introduced Figueroa's WhatsApp messages with Coboj-Acosta where they exchanged photographs of bagged pills -- which the government's witness identified as counterfeit oxycodone pills -- and discussed potential sale prices.

Undercover officers, including Hernandez, posed as money couriers (arranged with Magana's cooperation) and arrived at

Figueroa's restaurant to pick up $100,000 in cash. During the pickup, which was recorded by the officers via audio and video, Hernandez commented that it had been "hard to find merchandise" -- code for drugs, according to Hernandez -- to which Figueroa replied that he had no issues because, according to him, "I'm the factory." Hernandez asked Figueroa, "What do you work with, perico?" -- "perico" meaning cocaine, according to Hernandez. Figueroa replied, "con todo, with everything."

The body of evidence presented at trial as a whole, even stripped of Magana's testimony to which Figueroa now objects, overwhelmingly supports the conclusion Figueroa conspired to conduct financial transactions -- the hundreds of thousands of dollars in cash that Figueroa was observed handing off -- that represented the proceeds of drug trafficking. Accordingly, we will not vacate Figueroa's verdict on this basis.

## B. Law Enforcement Officials' Testimony

Figueroa next argues that the district court erroneously allowed overview and ultimate issue testimony from three law enforcement officials: O'Shaughnessy, Hernandez, and George. He also argues that, altogether, allowing these portions of testimony constituted cumulative error. Again, we disagree.

### 1. O'Shaughnessy

Figueroa argues that O'Shaughnessy provided impermissible overview testimony. "An 'overview witness' is a

government agent who testifies as one of the prosecution's first witnesses and, as the term implies, provides an overview or roadmap of the prosecution's case to come." United States v. Etienne, 772 F.3d 907, 913 (1st Cir. 2014). "Overview testimony is inherently problematic for at least three reasons: (1) the jury could be influenced by statements of facts and credibility determinations not in evidence; (2) later testimony could be different from what the overview witness assumed; and (3) the jury may place greater weight on evidence that they perceive has the imprimatur of the government." Id. (citation modified).

Figueroa challenges several different portions of O'Shaughnessy's testimony. Figueroa's trial counsel objected to some of this testimony contemporaneously, thus preserving the objections for appellate review, while others went without comment.

As Figueroa sees it, O'Shaughnessy provided improper overview testimony by:

- identifying Coboj-Acosta and Estrella (to which Figueroa objected but was overruled) and Campoy-Acuna (to which Figueroa did not object) as members of a drug trafficking organization working with Figueroa;

- previewing Magana's testimony about his texts and calls with Figueroa, including about the cash

transaction at the Yotel hotel (to which Figueroa did not object);

- describing two vehicle stops for which he was not physically present[3];

- describing Figueroa's detention and a search of his phone carried out partly by his "counterparts" at the Department of Homeland Security, as well as other aspects of the investigation of Figueroa directly known by other law enforcement officials (to which Figueroa did not object); and

- relaying hearsay about Figueroa's alias being "Maiky" or "Mikey" (to which Figueroa did not object).

For its part, the government concedes that some of O'Shaughnessy's testimony should not have been admitted but argues that any error was ultimately harmless and withstands any standard of review "given the overwhelming evidence that the half[-]million-plus dollars in cash [Figueroa] laundered as part of the six videotaped money drops was the proceeds of drug dealing."

The record here compels us to agree with the government and find that any error was harmless. As to the admission of

---

[3] Figueroa's counsel objected to some portions of O'Shaughnessy's testimony about one of the vehicle stops, but given the district court's pre-trial instruction to counsel not to make speaking objections, it is unclear whether he did so because he thought the testimony was improper overview testimony or for some other reason.

O'Shaughnessy's testimony about the identities of Coboj-Acosta, Estrella, and Campoy-Acuna, their ties to Figueroa, and their involvement with drug trafficking organizations, the government concedes that an error occurred. It also concedes that no subsequent trial evidence was offered regarding Estrella and Campoy-Acuna. But, when O'Shaughnessy testified about the identities of the three men, the district court immediately instructed the jury that "there is no guilt by association" and that they would "have to wait for evidence before [they] dr[e]w" conclusions about Figueroa's guilt. See United States v. Kuljko, 1 F.4th 87, 95 (1st Cir. 2021) (noting that a "swift and strong curative instruction" may render improperly admitted evidence harmless). And as discussed above, the government submitted evidence of WhatsApp messages between Coboj-Acosta and Figueroa discussing prices for pills, which O'Shaughnessy, "[b]ased on [his] experience in drug investigations," testified were illegal narcotics.

Even if the error were plain as to O'Shaughnessy's testimony about these three men, evidence about Estrella and Campoy-Acuna was never offered again. Beyond that, the text messages between Figueroa and Coboj-Acosta -- the admission of which Figueroa does not contest -- more directly establish Figueroa's involvement with illicit drug sales than

O'Shaughnessy's potentially erroneous testimony connecting Figueroa to Coboj-Acosta.

As for the rest of O'Shaughnessy's testimony at issue -- whether subject to harmless error or plain error review -- the substantial body of evidence discussed earlier again leads to the conclusion that any error was ultimately harmless. For instance, it was "highly probable" that any error did not influence the verdict, given the overwhelming evidence of Figueroa's direct involvement with the six money drops discussed at trial, all of which occurred under law enforcement surveillance. See United States v. Flores-de-Jesus, 569 F.3d 8, 27 (1st Cir. 2009). And while O'Shaughnessy's preview of Magana's testimony about Magana's correspondence with Figueroa does raise the concern that Magana's credibility may have been impermissibly bolstered as a result, see García-Sierra, 994 F.3d at 28, the government also introduced direct evidence of those exchanges, which did not depend materially on Magana's credibility -- the texts and recording of the call spoke for themselves. Finally, Figueroa has waived any argument about the rest of O'Shaughnessy's testimony, such as the purported hearsay testimony that "Maiky" was one of Figueroa's aliases, by failing to explain how the admission of this evidence harmed him in any way. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

We therefore see no basis for vacating Figueroa's conviction based on the portions of O'Shaughnessy's testimony at issue.

## 2. Hernandez

Figueroa next argues that Hernandez improperly opined on the ultimate issue by repeatedly calling the cash that he picked up from Figueroa at his restaurant "drug proceeds." Figueroa concedes that he objected to only one of Hernandez's uses of this term at trial and thus that, at minimum, some of his objections are not preserved.[4]

But even if all were preserved such that we applied the abuse of discretion standard (rather than plain error), we would again find this error harmless "[i]n the context of all of the evidence offered at trial." United States v. Rodriguez-Adorno, 695 F.3d 32, 39 (1st Cir. 2012). To be sure, a DEA agent's reference to disputed cash as "drug proceeds" might be prejudicial error in another case. But given the ample evidence that the money at issue here was drug proceeds, any purported error was harmless.

The jury heard testimony from Magana as a cooperating witness about Figueroa's use of Magana's money laundering operation. The jury saw text messages and other evidence

---

[4] As discussed in Section I.B.2.c, supra, Hernandez used the term "drug proceeds" at least four times on direct examination, to which Figueroa's trial counsel objected once, and four more times on cross-examination, to which Figueroa's counsel did not object.

suggesting Figueroa's direct involvement with drug dealing, including conversations about drugs and evidence of Figueroa's connection to misdirected FedEx packages containing drugs. And the jury was presented with recorded evidence of Figueroa telling Hernandez -- during the pickup of $100,000 in cash in Figueroa's restaurant set up with the help of a government informant -- that he dealt "with everything," not just "perico," a slang term for cocaine. In light of all the undisputed record evidence strongly linking the cash at issue in this trial to drug proceeds, we readily conclude that "'it is highly probable that the error did not influence the verdict,' and was thus harmless." Id. (quoting United States v. Rodriguez, 525 F.3d 85, 95 (1st Cir. 2008)).

### 3. George

Figueroa devotes less than half a page in his opening brief to argue that the testimony of auditor George also improperly reached the ultimate issue. Figueroa points to George's testimony that Coboj-Acosta was "Indio" and her characterization of bank activity here as "money laundering transactions." But we note from the start "the settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." Zannino, 895 F.2d at 17. We will not fashion an argument for Figueroa on this issue and thus find no cause for reversal in George's testimony, either.

### 4.  No Cumulative Error

Finally, we address Figueroa's argument that, even if none of the asserted errors warrant reversal in isolation, they cumulatively do.

"Under the cumulative error doctrine, a column of errors may have a logarithmic effect, producing a total impact greater than the arithmetic sum of its constituent parts.  In such rare instances, justice requires the vacation of a defendant's conviction even though the same compendium of errors, considered one by one, would not justify such relief."  United States v. Padilla-Galarza, 990 F.3d 60, 85 (1st Cir. 2021) (citation modified).

Here, however, Figueroa provides no account of the "logarithmic" accretion of harm resulting from each of these asserted errors.  We have already addressed why each of the arguments that Figueroa now repackages under the cumulative-error heading falter against the weight of trial testimony which Figueroa does not, and cannot, dispute.  Even taken together, we cannot conclude that these claimed errors were anything but harmless.  At bottom, we cannot see how the asserted errors so "synergistically achieve 'the critical mass necessary to cast a shadow upon the integrity of the verdict'" when considered holistically.  United States v. Rosario-Pérez, 957 F.3d 277, 302 (1st Cir. 2020) (quoting Williams v. Drake, 146 F.3d 44, 49 (1st Cir. 1998)).

- 26 -

### IV. Conclusion

For all these reasons, we **<u>affirm</u>** Figueroa's conviction.